Jane DOE, Plaintiff-Appellant,

v.

The REGION 13 MENTAL HEALTH–MENTAL RETARDATION COMMISSION, d/b/a Gulf Coast Mental Health Center, and G. Kinsey Stewart, Defendants-Appellees.

No. 82–4189.

United States Court of Appeals, Fifth Circuit.

May 19, 1983.

Rehearing and Rehearing En Banc Denied June 21, 1983.

James K. Wetzel, Gulfport, Miss., for plaintiff-appellant.

Nick B. Roberts, Jr., Gulfport, Miss., for defendants-appellees.

Before POLITZ and JOLLY, Circuit Judges, and HUNTER *, District Judge.

* District Judge of the Western District of Louisi-

E. GRADY JOLLY, Circuit Judge:

This appeal comes from a grant of judgment notwithstanding the verdict by the court below in favor of the defendants-appellees Region 13 Mental Health-Mental Retardation Commission, d/b/a Gulf Coast Mental Health Center ["GCMHC"] and the Executive Director of GCMHC, Dr. G. Kinsey Stewart, entered against the plaintiff-appellant Jane Doe, a former employee at GCMHC. The case involves an alleged violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

Because we find that the district court's grant of the J.N.O.V. was proper under the standards set forth in *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc), we affirm.

## I.

Region 13 is one of fifteen regional programs authorized by the Mississippi State Legislature in the early 1970's to comply with the National Community Mental Health Centers Act, 42 U.S.C. § 2681, *et seq.,* begun during the Kennedy administration. The program seeks to provide out-patient, in-patient and emergency treatment for persons suffering mental disorders. Region 13 comprises a cooperative effort among Harrison, Hancock, Pearl River and Stone Counties in south Mississippi and is governed by a voluntary Board of Commissioners.

GCMHC is a mental health center operated by Region 13, with its main offices located in Gulfport, Mississippi. GCMHC operates thirteen programs, including programs specifically designed for children. As executive director, Dr. Stewart has general administrative responsibility over the center and its seventy-odd employees. Dr. Stewart has been director of GCMHC since its inception.

GCMHC is funded through a complex mixture of federal, federal-state, state and local financing. The federal funding has been primarily of a block-grant nature, for specific purposes, including a "Children and Youth Grant" which funds staffing of the program for children.

ana, sitting by designation.

Ms. Doe was reared outside of Mississippi. She obtained an undergraduate psychology degree in an eastern state and in 1977 obtained a graduate degree in psychology also from a university in that state.

Ms. Doe began suffering spells of anxiety, insomnia and depression in 1977. Over a six-to-eight month period she saw a psychiatrist on a weekly basis. The psychiatrist prescribed sleeping pills to help with her problems. At one point in 1977 Ms. Doe took a potentially lethal overdose of the pills and had to be hospitalized for a brief time. Although at trial Ms. Doe did not characterize this incident as an effort to commit suicide, it is capable of being so interpreted.

In June 1978 Ms. Doe applied with GCMHC to work in the Children and Youth Services program. On her application, she stated that her "general health" was "excellent" and that she had no "physical handicap or defect which would prevent a normal performance of duties." Ms. Doe was hired in August 1978 on a probationary basis as a Mental Health Associate with the Child Youth Service program.

By all accounts, Ms. Doe was a superior employee. She maintained a heavy caseload, working at any one time on a one-to-one basis with some thirty out-patient children and adolescents and with their families. She also worked with a local public school and with the local Head Start agency.

According to her immediate supervisor, Ms. Doe "did an excellent job." She carried one of the heaviest caseloads, saw more patients and did a good job as consultant with the local school. Her paper work was prompt and thorough. She had no problems with absenteeism. In February 1979, after an evaluation of her work which found her to be "outstanding," her probationary status was removed and she was given a raise.

Essentially, Ms. Doe continued to do an outstanding job by all objective standards until her termination in November 1979. She worked hard, was diligent and thorough, her patients liked her, and she had no excessive absences from work. She was reevaluated in October 1979, and again was rated "outstanding." She also received another pay raise.

Unfortunately, during the entire term of her employment at GCMHC, Ms. Doe suffered from essentially the same psychological symptomology as she had in 1977. Finding the Mississippi Gulf Coast something of a "culture shock," Ms. Doe continued to experience anxiety and depression after her move there in August 1978. The heat bothered her, the minor day-to-day problems of life bothered her, and she had great difficulties simply in "coping." She was lonely and missed her family and friends in her home state. She had little money, and her apartment was without telephone or furniture.

Her sole source of pleasure and stability was her work. The depression she suffered usually came on the weekends.

In November 1978, three months after moving to her new home and job, Ms. Doe began psychotherapy with a local clinical psychologist, Dr. Joseph Tramontana. Dr. Tramontana was a part-time staff member at GCMHC who maintained a private practice.

Over the course of these weekly, forty-five to fifty-minute sessions, which continued into the summer of 1980, Dr. Tramontana developed the following diagnosis of Ms. Doe. A "depressive neurosis" was the primary psycho-symptomology. She was alone and had a "great deal of difficulty being alone." She suffered from chronic insomnia and frequently resorted to drug/alcohol ingestion to counter that insomnia. She also suffered serious depression as a result of an unsatisfactory relationship with a man.

In stressful situations Ms. Doe employed a "numbers game" as a blocking technique to avoid dealing with the problem. This numbers game essentially involved adding random numbers in her head. Also, she had experienced a plane crash on her way to interview for the job in Mississippi, and for a time had an irrational phobia about planes. In addition, for a time she "daydreamed" that a monster was chasing her through a cemetery.

Most significantly, Ms. Doe's psychologist was concerned about the possibility of suicide. He considered the incident with the sleeping pills when Ms. Doe was a graduate student to be a serious attempt at suicide. And throughout her sessions with Dr. Tramontana, Ms. Doe made numerous references to the possibility and availability of suicide as an acceptable option. Occasionally Ms. Doe would call Dr. Tramontana and leave messages on his telephone answering machine, hinting at suicide. Over the course of her therapy with Dr. Tramontana, Ms. Doe made repeated references to suicide as a possible solution to her problems. Dr. Tramontana, believing that Ms. Doe had tried to kill herself once, felt that she continued to consider suicide "a viable alternative" and that she "might do it again."

Ms. Doe's condition, although consistently depressive-neurotic, fluctuated in its severity. Those fluctuations, according to her psychologist, were significant in the late-winter, early-spring of 1979.

In early May 1979, shortly after Ms. Doe had experienced problems with her boyfriend, Dr. Tramontana was leaving for the weekend. Thus left without her principal "support systems," Ms. Doe was anxious about facing the weekend. She did not want Dr. Tramontana to leave and asked for a back-up therapist. Dr. Tramontana suggested Dr. Leonard Ball, a psychiatrist who was the Medical Director at GCMHC. Dr. Ball talked with her, and she explained her difficulties, telling him that she wanted "the world to stop." Dr. Ball was concerned about her well-being and asked that she meet him at the emergency room at Gulfport Memorial Hospital. Dr. Ball recommended brief hospitalization to see if medication might alleviate her depression. She voluntarily admitted herself to the hospital and stayed for two or three days. She experienced no apparent problems with her work or her caseload as a result of her hospitalization.

The medication did not have any significant ameliorative effect, however, because at the end of May, Ms. Doe was rehospitalized. Her mother and stepfather were coming to Gulfport to see her because her brother, who lived in Mississippi, had told them about her first hospitalization. Dr. Tramontana was again going to be out of town for the weekend, and Ms. Doe preferred going to the hospital rather than facing her parents. Dr. Tramontana arranged with Dr. Ball to readmit her. Again, she remained in the hospital for two or three days. During this second hospital stay, Dr. Ball suggested to Ms. Doe that she should consider long-term hospitalization.

Over the course of the summer Ms. Doe remained fairly stable and continued to do a good job. Her immediate supervisor, Dr. Calhoun, while feeling that she was doing good work, was concerned about her obvious anxiety and agitation and recommended to her that she should be seeing someone.

Ms. Doe's anxiety worsened in early August, and she experienced great difficulty sleeping. She hadn't been able to sleep for two or three nights and went to Dr. Ball and asked for medication. He prescribed chloral hydrate, a potent sleeping pill, which she took home but did not take for fear that she could not hear the foster child whom she had taken in and with whom she was living at the time. Again, she couldn't sleep, and she called Dr. Tramontana, explained her problem, and he recommended that she call Dr. Ball. When she saw Dr. Ball at work he recommended that she readmit herself to Gulfport Memorial Hospital. She did so.

During this third hospitalization, which again was brief, Dr. Ball again recommended long-term hospitalization, preferably for one year. Dr. Tramontana did not agree with this suggestion, but thought that more intense psychotherapy was warranted, with more frequent sessions.

No change was made in Ms. Doe's treatment, however; she continued her good work; she continued to be depressed; and she continued her weekly one-hour sessions with Dr. Tramontana. In October she again was rated "outstanding" and given another pay increase.

The culminant event in Ms. Doe's employment occurred in November 1979. Two events precipitated this last crisis—her thirtieth birthday was to occur on November 10 and Dr. Tramontana was going out of town.

Ms. Doe made statements to Dr. Tramontana, to her co-workers and to her friends that she would not "see" her thirtieth birthday. She indicated that she was going to kill herself by dropping her hair dryer into the bathtub and electrocuting herself. She indicated that she had made arrangements for her clients to be taken care of, for her foster child to be taken care of, and that she had left her insurance policy where it could be found.

Dr. Tramontana was greatly concerned about Ms. Doe and felt that she was suicidal.[1] Dr. Tramontana informed Ms. Doe's brother through a friend that the brother had the alternative either to institute commitment proceedings or "have her kill herself." The brother thereupon swore out the necessary affidavits to institute Ms. Doe's commitment, and on November 8 at approximately 11:00 p.m., Ms. Doe was taken by police from her home to the psychiatric ward at Gulfport Memorial Hospital. The next day she was "interviewed" by the two on-call doctors for commitment purposes, one of whom happened to be Dr. Ball. Based on the interview, it was determined that Ms. Doe was sufficiently dangerous to herself to warrant further commitment proceedings before the chancery court.

A preliminary hearing was held with testimony as to Ms. Doe's condition from the interviewing doctors and from Ms. Doe. The court felt that Dr. Tramontana was best suited to testify as to Ms. Doe's condition, however, and postponed further hearings until he was able to present testimony to the court. Dr. Tramontana flew back to Gulfport and visited Ms. Doe. He felt that her mood was elevated and that she was no longer suicidal. She promised him that she would be a better patient and that she would allow him to hypnotize her to uncover her past. According to Dr. Tramontana, she "sounded like a completely different person . . . ." He made a tape for the court discussing Ms. Doe's condition and recommended against commitment. Proceedings were dismissed against Ms. Doe, and she was released from the hospital. She returned to work the same day. She reported to her supervisor, Dr. Calhoun, who assured her that nothing had changed.

During this immediate time period, Dr. Ball, who by now was intimately familiar with Ms. Doe's psychopathology, discussed her case with Dr. Stewart, the administrator at GCMHC. In his role as Medical Director at GCMHC, responsible for the medical care provided at the center, Dr. Ball informed Dr. Stewart of Ms. Doe's involuntary hospitalization, of her apparently serious potential for suicide, and of her need, in his opinion, for long-term hospitalization. Dr. Stewart had been aware of Ms. Doe's previous hospitalizations and her ongoing psychiatric problems, but, according to the testimony at trial, this was the first time Dr. Ball had given him the specifics of her case and had indicated the need for long-term treatment. Dr. Ball recommended that Ms. Doe be given the option of taking a leave of absence to "seek another mode of therapy" or that she be terminated. He informed Dr. Stewart that he was concerned about the well-being of Ms. Doe's patients and the impact that her suicide could have on them. Dr. Ball felt that Ms. Doe "was more impaired than the patients she was seeing."

Based on Dr. Ball's recommendation, Dr. Stewart ordered that Ms. Doe not see any more patients. He met with her the day following her return to the center and explained to her his feelings about the situation. According to Ms. Doe, he told her that he was "concerned about funds and public image" and that she could either resign or take a long-term leave for hospitalization with no job upon her "return." According to Dr. Stewart, he told her that she should consider seeking employment elsewhere or take a long-term leave for hospitalization with consideration for rehiring in the future based on her medical

---

1. According to Dr. Tramontana's testimony, he "was more concerned at this time than at any time before because of some of her statements concerning insurance policies and wanting some of her patients to be taken care of and so on, and I was afraid that she might in fact harm herself this time."

status. According to Dr. Stewart, he did not tell her that her job would be phased out.

Ms. Doe considered her options over the Thanksgiving holidays. Upon returning to the clinic after Thanksgiving, she told Dr. Stewart she could not accept his recommendation. She told him that if she were terminated she would go to the local newspaper and reveal how GCMHC treated depressive neurosis. Dr. Stewart thereupon terminated her as an employee.

## II.

Ms. Doe filed suit claiming that Dr. Stewart and GCMHC had violated her rights under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[2] Ms. Doe sought damages of $12,000 for her lost wages and $100,000 for pain and suffering and for detriment to her future career. She also sought reinstatement and attorneys' fees.

This case was tried before a jury.[3] After trial, in which testimony was received from Ms. Doe, Dr. Tramontana, Dr. Ball, Dr. Stewart, Dr. Calhoun and Dr. Patsy Zakaras, who was program evaluator for the Children's Services Division at GCMHC, the jury found for Ms. Doe and awarded her $25,000 in damages and stated in its verdict that Ms. Doe "should be reinstated." Judgment was entered by the court reflecting that verdict.

Subsequently, the court entertained the defendants' motions for judgment notwithstanding the verdict or, alternatively, for a new trial, and for remittitur of damages. The court ruled that the evidence failed to support the verdict and set aside the verdict.

## III.

We note as a preliminary matter that the jurisdictional requirements have been met here.[4] There are essentially two jurisdic-

---

**2.** "No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

**3.** While we specifically do not decide this issue, jury trials do not appear to be a matter of right under the Rehabilitation Act of 1973. 29 U.S.C. § 794a(2) provides that the "remedies, procedures and rights" available under title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, are "available to any person aggrieved by any act or failure to act by any recipient of Federal assistance ... under section 794 of this title." For a discussion of the similarities between section 504 and title VI, *see Lloyd v. Regional Transportation Auth.*, 548 F.2d 1277, 1280 n. 9 (7th Cir.1977). The "remedies ... and rights" available under title VI, like those under title VII, are essentially equitable in nature, and the "procedures" available do not include juries. *Cf. Lorillard v. Pons*, 434 U.S. 575, 583–84, 98 S.Ct. 866, 871–72, 55 L.Ed.2d 40 (1978) (indicating in dictum that jury trial not available under title VII); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir.1979); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir.1969) (determination of equitable relief under title VII to be made by court rather than by jury). The remedies available under title VI are equitable, *see generally Gautreaux v. Romney*, 448 F.2d 731, 734 (7th Cir.1971), and, as such, fall within the district court's province, not a jury's. *See Giles v. EEOC*, 520 F.Supp. 1198, 1200 n. 1 (E.D.Mo. 1981) (no jury trial available under section 504.)

Under Fed.R.Civ.P. 39(a), however, when a jury trial has been demanded in accordance with Fed.R.Civ.P. 38, as was the case here, a jury trial is appropriate unless the parties stipulate to trial without a jury or unless the district court of its own motion or initiative finds that jury trial is not proper. *See Taylor v. Gulf States Utility Co.*, 375 F.2d 949, 950 (5th Cir. 1967). No stipulation was entered here nor did the court act *sua sponte.*

The inappropriateness of trial before the jury is underscored by the apparent absence of legal damages available under section 504. While this circuit has not expressly decided the issue of recoverability of legal damages under title VII, other circuits have held such damages to be unrecoverable and that only equitable damages, such as back pay and the injunctive relief of reinstatement are allowable; as such, the relief is to be ordered by the court, not the jury. *Richerson v. Jones*, 551 F.2d 918, 926–28 (3rd Cir.1977); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308–10 (6th Cir.1975), *vacated on other grounds sub nom. Utility Workers v. EEOC*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977). This issue is, of course, largely mooted by the court's subsequent J.N.O.V. ruling.

**4.** For a discussion of the existence of a private right of action under § 504, *see Helms v. McDaniel*, 657 F.2d 800, 806 n. 10 (5th Cir. 1981), *cert. denied* 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1983); *Camenisch v. University of Texas*, 616 F.2d 127, 130–34 (5th Cir. 1980), *vacated as moot on other grounds,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

tional prerequisites in a section 504 case, to wit, that the plaintiff be "handicapped" and that the program in which the plaintiff would be involved be federally funded.

■ Under 29 U.S.C. § 706(7)(B), a handicapped person is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." [5] A mental handicap, such as claimed by Ms. Doe, therefore qualifies under the applicable statute.[6] The parties did not, in fact, contest the issue of whether Ms. Doe was handicapped within the ambit of § 504, and, based on the record, Ms. Doe was so handicapped.

■ The next jurisdictional prerequisite is that the program itself be federally funded. In our decision in *Brown v. Sibley,* 650 F.2d 760, 767–69 (5th Cir.1981), we held that a plaintiff must show that the specific program with which the plaintiff was involved received or directly benefitted from federal financial assistance. The plaintiff demonstrated here that the program with which she was involved, the "Children and Youth Services" program, received funds for staffing from the federal government. It therefore appears that the specific program with which Ms. Doe was involved was federally funded. This fact is not contested; indeed, jurisdiction is not contested. The district court therefore did have jurisdiction under section 504 of the Rehabilitation Act of 1973.

**IV.**

Having found that the plaintiff was "handicapped" within the coverage of the Act, we next turn to the more difficult question under section 504, that is, whether the plaintiff was "otherwise qualified" within the meaning of the Act, or whether the district court correctly found that the evidence produced by the plaintiff did not support the conclusion that she was so qualified.

■ The Supreme Court in *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979), stated: "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." The plaintiff contends that sufficient evidence was presented to the jury to allow a finding that she was "otherwise qualified" and that she therefore was terminated from her employment in violation of the Act. The plaintiff had an exemplary work record. All of the evaluations of her work were highly complimentary of her ability and willingness to undertake a heavy case load. Despite her handicap, her attendance record was acceptable. Her paper work was good. And apparently her interpersonal relationships with other members of the clinic staff were good; no mention was made at trial of any problems with other staff members.

On the other hand, the plaintiff had exhibited serious suicidal tendencies over a long period of time, at least since 1977, when she attempted to commit suicide

---

**5.** 45 C.F.R. § 84.3(j)(2)(ii) defines "major life activities" as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

**6.** *See Gladys J. v. Pearland Independent School Dist.,* 520 F.Supp. 869 (S.D.Tex.1981) (organic childhood schizophrenia qualified as handicap); *Halderman v. Pennhurst State School & Hosp.,* 446 F.Supp. 1295 (E.D.Pa.1978) (retarded individual handicapped within the coverage of the Act); *Drennon v. Philadelphia General Hosp.,* 428 F.Supp. 809 (E.D.Pa.1977) (epileptic stated colorable cause of action under § 504); 43 Op. Att'y Gen. No. 12 (April 12, 1977) (Act covers drug/alcohol dependents).

The "Catch-22" implicit in virtually all section 504 actions is particularly evident in this

case, that is: Ms. Doe was required to prove her handicap for jurisdictional purposes, but simultaneously required to prove that she was not so handicapped as to be unqualified to perform her job. Of course, the initial jurisdictional burden is met by presentation of a "colorable claim." For a discussion of the appropriate presentation of proof in section 504 cases, *see Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1386–87 (10th Cir. 1981) (adopting presentation similar to, though necessarily different from, that prescribed for disparate treatment cases under Title VII in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

while in graduate school. The plaintiff had been in fairly intensive psychotherapy with Dr. Tramontana since November of 1978, for approximately a year, and had not shown noticeable improvement. Rather, the situation seemed to be deteriorating, based upon her two hospitalizations in May, her hospitalization in August, and the very serious chain of events in November of 1979 which led to the institution of involuntary commitment proceedings. Her psychotherapist, Dr. Tramontana, considered that she might, in fact, kill herself in the early part of November 1979, and Dr. Ball, who was fairly closely involved with her case, also felt that she was suicidal.

According to Dr. Stewart, based upon the recommendation given to him by Dr. Ball, he felt that Ms. Doe was a threat to herself and that it was in the best interests of the patients at GCMHC to terminate her employment or at least to have her take a long-term leave of absence so that she could undergo intense psychiatric therapy on an in-patient basis. All of the doctors who testified as to her condition testified that a therapist who accepts suicide as a reasonable alternative may pass along this bias to his or her patients. Additionally, Dr. Stewart and Dr. Ball testified as to their concern about the effect which a therapist's suicide would have on that therapist's patients.

Dr. Ball made his recommendation that Ms. Doe not be allowed to see patients because of his belief that she might commit suicide. "My concern was her future performance, not her past performance .... My clinical impression at the time of the commitment was that she was severely depressed and suicidal. That's what made me concerned regarding her future work performance."

In sum, the plaintiff presented her case to the jury that she was "otherwise qualified" based on her excellent past record at GCMHC. On the other hand, the defendant GCMHC presented its evidence supporting termination of Ms. Doe's employment based on the state of her condition as of November 1979. The hospital argued that although she might have been qualified in the past, her condition had deteriorated to the point where she no longer could be relied upon to be an effective therapist.

In analyzing this case, we first must look to the standards set forth in *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969), where we set forth the standard for evaluating the grant of J.N.O.V. motions.

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied and the case submitted to the jury.[7]

Because we find that the evidence overwhelmingly supported Dr. Stewart's action here with regard to Ms. Doe, we find that the district court did correctly grant the judgment notwithstanding the verdict.

We start with the premise that there was no evidence produced of any discriminatory animus against persons with handicaps such as Ms. Doe's. Significant testimony was presented supporting the fact that GCMHC had several employees who suffered from depression and who were undergoing psychiatric counseling. No action was shown to have been taken against these individuals because of their psychiatric problems. Further, while Ms. Doe would have us find damning the fact that GCMHC knew of her problems as early as April of 1979 and did nothing about them, we are not persuaded

7. As discussed *infra* at page 1412, whether "reasonable men ... might reach different conclusions" as to the facts depends not only on the facts, but on the legal standard applicable to those facts.

by this fact. Rather, it supports the defendants' contention that it was only when the problem worsened to an unacceptable level that Dr. Stewart felt that action was necessary.

In determining whether Ms. Doe was "otherwise qualified" under the Act, we believe that, in the absence of any evidence of such discriminatory animus as discussed above, we must analyze the actions by GCMHC to determine whether there was a substantial, reasonable basis for its decision. Then we must apply *Boeing Co. v. Shipman* to determine whether the J.N.O.V. rendered was appropriate under this standard of review.

This standard, crucial to the analysis of employment decisions under section 504, is based on our reading of the Supreme Court's decision in *Southeastern Community College v. Davis.* In *Davis,* the Supreme Court considered whether the defendant college, a state institution receiving federal funds, had acted discriminatorily in denying admission to the plaintiff into the defendant's nursing program because of the hearing handicap suffered by the plaintiff. The court of appeals, in reversing the decision by the district court, had held that under section 504 the plaintiff's application should have been considered without regard to the handicap and that in considering whether she was "otherwise qualified," the college had to limit its inquiry to her academic qualifications.

The Supreme Court, in reversing the court of appeals, held that while section 504 means that mere possession of a handicap is not a permissible ground for "assuming an inability to function in a particular context," 442 U.S. at 405, 99 S.Ct. at 2366, an institution is not required to ignore limitations which result from the handicap. Finding that an institution could reasonably consider the effect of the handicap involved, the Court turned to the particular qualifications of the plaintiff as they bore on the requirements for matriculation at the college. The Court found that the col-

lege was justified in its determination that plaintiff would pose a threat to patients' safety if she participated in the clinical phase of the nursing program. Because of her hearing handicap, she could not safely participate in a clinical setting. The Court found that the plaintiff would be very limited insofar as the nursing courses which she could take and the services which she could render as a nurse. Further, the Court found that nothing in the legislative history or in the language of section 504 required affirmative action by a participating program. Thus, the Court held that the community college was not required to supply the "extensive modifications necessary to include" the plaintiff in the nursing program. 442 U.S. at 410, 99 S.Ct. at 2369.

■ We read this landmark case under section 504 to support a reasonable deference to the decisions made by administrators of federally funded programs so long as no evidence is presented of discriminatory intent with regard to the handicapped person. To repeat, "an otherwise qualified person is one who is able to meet *all* of a program's requirements in spite of his handicap." 442 U.S. at 406, 99 S.Ct. at 2367 (emphasis added). This assumes, of course, that "a program's requirements" are reasonable. 442 U.S. at 414, 99 S.Ct. at 2371.

That we should grant deference to Dr. Stewart's decision in this case is underscored by the nature of the problem which is involved. This is not a case involving whether an employee is able to screw nuts and bolts onto a widget with sufficient speed. No such cut-and-dried factual proof is available when dealing with the "soft science" surrounding the health or affliction of an individual's psyche. Of course we must give weight to an expert's determination where there is no showing that such determination was skewed by unlawful animus.[8]

In *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981), an applicant for medical school, who was a gifted student, suffered serious psychiatric and mental disorders.

---

8. We certainly do not suggest that absolute deference is required. No rubber-stamp approval is suggested hereby. A sound, thorough record substantiating the expert's decision must be developed.

She was self-destructive and imminently capable of violence. Her history included numerous acts of self-destructiveness. She was basically diagnosed as a "borderline personality" with very poor chances for improvement. The applicant had initially been admitted to the medical school after misrepresenting on her application her serious psychological problems. Subsequently, New York University discovered that she did have such serious problems. The plaintiff remained in school from September 1975 through January 1976, when the school requested that she resign, take a leave of absence, and see if she could improve her psychopathology with treatment. The court did not discuss how she was performing as a medical student. The plaintiff reapplied after subsequent treatment which found her to suffer from "chronic, neurotic depression," albeit a treatable condition. 666 F.2d at 769. The university re-interviewed her and refused readmission, at which point the plaintiff filed suit.

The plaintiff had meanwhile been admitted to the Harvard School of Public Health. During the pendency of her law suit she received her master's degree and worked at the Department of Health, Education and Welfare. While employed at HEW, she received promotions and was evaluated as an "excellent" employee. There was no evidence of self-destructiveness or anti-social behavior over a five-year period. The school still would not admit her, and she sought an injunction requiring admission to the medical school. She obtained affidavits from several psychiatrists stating that in their judgment she was fit to attend medical school.

The university contended that its decision not to admit the plaintiff should be upheld as long as "a substantial basis" existed for its decision. 666 F.2d at 771.

The district court ordered that the plaintiff be admitted to the medical school. On appeal, the court of appeals reversed, stating that:

> An institution may take an applicant's handicap into consideration, along with all other relevant factors, in determining whether she is qualified for admission.

*Southeastern Community College v. Davis,* 442 U.S. at 406 [99 S.Ct. at 2367]. The institution need not dispense with reasonable precautions or requirements which it would normally impose for safe participation by students, doctors and patients in its activities. Section 504 simply insures the institution's even-handed treatment of a handicapped applicant who meets reasonable standards so that he or she will not be discriminated against solely because of the handicap. But if the handicap could reasonably be viewed as posing a substantial risk that the applicant would be unable to meet its reasonable standards, the institution is not obligated by the Act to alter, dilute or bend them to admit the handicapped student. *Southeastern Community College v. Davis,* 442 U.S. at 413 n. 12, 99 S.Ct. at 2370.

666 F.2d at 775.

The court in *Doe* then proceeded to discuss its limited ability, versus the ability of medical professionals, to determine the qualifications for entry into medical school and whether a person meets the legitimate standards for admission. "[C]onsiderable judicial deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons." 666 F.2d at 776. Essential to the court's analysis was its determination that the plaintiff's good record, as here, during the immediately preceding period of time was not sufficient to overcome the school officials' legitimate concern that the behavioral disorder might recur.

> In light of the type of behavioral disorder presented which could result in a recurrence after a dormant period, expert opinion was entitled to greater weight in reaching a decision as to whether Doe was qualified.

666 F.2d at 777.

The court therefore found that "a substantial basis exists for upholding NYU's decision to deny [the plaintiff's] readmission." 666 F.2d at 779. The court went on to state in an important footnote that:

Care must be exercised by schools and employers (and courts assessing their decisions under 504) not to permit prior mental illness to be routinely regarded as a disqualification. This case, however, involves not simply a prior mental illness; Doe has been diagnosed as having a recognized disorder for which long-term treatment has been prescribed by competent psychiatrists and Doe has declined to accept such recommended procedure.

666 F.2d at 779 n. 10.

We believe that in cases of this sort where, as here, there has been no showing of discriminatory animus, and where there is uncontroverted evidence of a chronic, deteriorating situation which is reasonably interpreted to pose a threat to the patients with whom the employee must work, no violation of section 504 could reasonably be found.

Other decisions have supported the use of a substantial justification test to analyze employment decisions under section 504. *See Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir.1977); *Pinkerton v. Moye,* 509 F.Supp. 107, 114 (W.D.Va.1981) (decision by school board was "reasonably based" and "substantially justified"). *But see Pushkin v. Regents of University of Colorado,* 658 F.2d at 1383 (mere fact that the defendant university acted in a rational manner held no defense to an act of discrimination).

It is in the light of this standard of review that we apply *Boeing Co. v. Shipman, viz.:* Was the totality of the evidence so overwhelming that Dr. Stewart was reasonably justified in believing that Ms. Doe was not "otherwise qualified" and therefore was justified in terminating her employment that reasonable men could not differ? We think the answer is yes.

Substantial, rational bases existed for Dr. Stewart's action here. He could not be expected to stand idly by, knowing that Ms. Doe's behavioral disorder might have severe consequences for all concerned. Besides the deleterious effect which suicide or an attempt at suicide would have upon Ms. Doe's patients, there was the question of the ongoing deleterious effect which her continued suicidal ideation was having upon those patients, who were susceptible and suggestible adolescents. Despite the excellent record which Ms. Doe had compiled during her employment at GCMHC, the record fully supported the fact that Dr. Stewart did not act in a discriminatory manner with regard to the termination of her employment. She had been "otherwise qualified," but there was strong and overwhelming evidence, and considered professional opinion, that she was no longer "otherwise qualified."

We therefore conclude that, viewing the evidence under the proper legal standards set forth above, reasonable men could not have differed about the validity of the decision that she was no longer qualified made by Dr. Stewart and by GCMHC, and that the granting of the judgment notwithstanding the verdict was appropriate.

AFFIRMED.