Cynthia FREY, Appellant,

v.

**RAMSEY COUNTY COMMUNITY HUMAN SERVICES, et al.,
Respondents.**

No. C9-93-2474.

Court of Appeals of Minnesota.

June 7, 1994.

Stephen W. Cooper, Kathryn J. Cima, The Cooper Law Firm, Minneapolis, for appellant.

Tom Foley, Ramsey County Atty., Kristine Legler Kaplan, Asst. County Atty., St. Paul, for respondent.

Considered and decided by PARKER, P.J., and HUSPENI and MULALLY *, JJ.

## OPINION

HUSPENI, Judge.

Cynthia Frey challenges the trial court's summary judgment holding that Frey cannot pursue her claim for discriminatory refusal to renew a contract for provision of emergency shelter care because evidence acquired after the nonrenewal shows Frey was not qualified to be an emergency shelter care provider. We affirm.

## FACTS

Cynthia Frey became a licensed foster care provider in Ramsey County (the county) in August of 1987. After initially providing

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

respite care, Frey began providing substitute emergency shelter care in 1989. In 1990 and 1991, Frey entered into contracts with the county to provide emergency shelter care for children.

County contracts with emergency shelter care providers who provide short-term (under 30 days) placement of children of various ages in the shelter care providers' homes. The contracts are annual, running from January 1 until December 31 of the contract year. Because this is emergency placement, the shelter care providers must be ready to accept children on very short notice and at any hour of the day or night. Frey was aware of the nature of the responsibilities involved, having grown up in a home in which shelter care was provided. Frey's parents were, and still are, shelter care providers.

Before Frey could be licensed to provide respite care and emergency shelter care, her home had to meet requirements of state regulation. Therefore, Frey and her husband built bedroom space in the downstairs area of their house. The modifications, which also included fire alarm and security measures, cost approximately $10,000. Frey also bought a $20,000 van to enable her to carry out her shelter care duties.

One of the duties imposed on Frey by the contract with the county was to report to the supervising agency any serious family illness.

Frey was also required to comply with the licensing requirements of the Minnesota Department of Human Services and to be available for placement of children 24 hours a day, 7 days a week, for 11 months of the year.[1]

In October 1989, Frey was diagnosed with gestational diabetes. Frey's emergency shelter care provider contract was renewed effective January 1, 1990; Frey's third child was born in February of 1990. The birth of Frey's third child did not resolve her diabetes, and in June of 1990 Frey was diagnosed as having type I insulin-dependent diabetes mellitus. She was hospitalized for two days for education and insulin regulation. Frey informed the county of the diagnosis.

Frey began treatment with Dr. Victoria Buoen, a licensed psychiatrist, in June of 1990, and on July 3, 1990, was hospitalized for a psychiatric consultation to evaluate her anxiety over her diabetes diagnosis. Hospital records indicate that Frey was checking her blood sugar up to 60 times a day and fearful that she would develop all of the long-term complications of diabetes, including amputations and visual problems. In addition to her concern about diabetes, Frey's ten-year history of sexual abuse surfaced during her July 1990 hospitalization. She exhibited symptoms of posttraumatic stress disorder;

1. The Department of Human Services has promulgated rules for licensing of facilities for children. *See generally* Minn.R. ch. 9545 (1989). The Department's rules require that foster care providers must "be kind, mature, and responsible people with a genuine liking for children." Minn.R. 9545.0090 (1989). The rules represent the Department's recognition that:

> Children who must live apart from their own homes are uniquely in need of stable, understanding families. Many children needing placement are emotionally, mentally, or physically handicapped. These children need extra understanding and parenting to cope with their problems.
> *Id.* For this reason, foster care providers must (2) have optimism, a sense of humor, resiliency, and ability to enjoy life; * * * (4) have health and vigor to meet the needs of children placed with them.
> *Id.*

The Department of Human Services may consider the age or physical handicap of a foster care provider to the extent that it affects the provider's ability to provide adequate care to foster children or affects an individual child's adjustment to the foster family. Minn.R. 9545.-0110 (1989).

An applicant for a foster care license must provide a statement from the applicant's physician stating either that the members of the family have received physical examination and are physically able to provide care to children or that members of the family are receiving any necessary continuing medical care and are physically able to provide care for foster children. Minn.R. 9545.0140, subpt. 1 (1989). "The health of persons living in the [foster care home] shall not be a hazard to the children." *Id.* The local agency, in this case Ramsey County, in its discretion, may require a physical examination of any person living in the foster care home. *Id.* The local agency may also require a mental health examination of any person in the foster care home as a requirement for licensure if, in the opinion of the agency, the person exhibits a mental health problem. *Id.*, subpt. 2. Children in foster care must be adequately supervised at all times. Minn.R. 9545.0190, subpt. 4 (1989).

in addition, her panic disorder, for which she had received treatment since 1987, worsened. In July and August of 1990, Frey did not do any shelter work. Frey's contract with the county was renewed for 1991.[2]

In March of 1991, Mary Jo Hassel became shelter care coordinator for the county, replacing Cannon. During 1991, Hassel had concerns about Frey's ability to continue to provide emergency shelter care. She met with Frey and her husband and advised them that their shelter care contract would not be renewed for 1992. During a meeting on October 2, 1991, Hassel offered to allow Frey and her husband to continue as foster care providers in a less stressful program. The Freys did not accept this offer.

Because the 1991 contract was still in effect, the county continued to place children in the Frey home. In mid-November of 1991, Frey was again hospitalized because of her anxiety and panic disorder. As a result of the worsening of her panic disorder and anxiety, Frey's diabetes became more difficult to control. Dr. Buoen stated that the county's refusal to renew Frey's contract resulted in serious emotional injury and hospitalization to Frey.[3] Frey did not tell the county of her November 1991 hospitalization, during which time the county continued to place children in Frey's home. It was not until December 26, 1991, that Hassel learned Frey had been hospitalized. Hassel suspended all referrals upon learning this.

Frey sued the county over the nonrenewal of her emergency shelter care contract, alleging disability discrimination, reprisal discrimination and public service disability discrimination in violation of Minn.Stat. § 363.03,

subds. 4, 7 (1992).[4] The complaint also asserted claims for promissory estoppel and intentional infliction of emotional distress. In the course of discovery, the county examined Frey's social security disability file.

In an application for social security disability benefits on October 18, 1991, Frey stated that she became unable to work because of her disabling condition on October 15, 1989. In obtaining information for the Social Security Administration to evaluate Frey's application for disability benefits, Carl Quella, a disability specialist for the Minnesota Department of Disability Services, interviewed Frey, Frey's mother, Veronica Sletten, and Dr. Buoen. Frey stated to Quella that she became disabled in October of 1989 "because that is when her panic attacks and depression began to get worse. And that is when she switched from being a respite care worker to operating an emergency shelter."

According to the information submitted to the Social Security Administration, Frey was unable to take care of herself or her children; the child care responsibilities fell on other family members; Tim Frey quit his job in October of 1989 in order to help Frey with the foster care work; Tim Frey spent at least 24 hours per week helping with the foster care work; when he was not home, Frey took the foster care children to her mother's house and her mother helped care for the foster children with Frey; Frey's father and sisters also helped her.

The social security disability records also indicated that Frey had been on antidepressants since 1990, has had panic attacks during which she becomes nonfunctional and

2. Under her contract, Frey was to provide 1,000 units of care annually. One unit of care is defined as caring for one child for one day. In 1990, Frey provided 911 units of care; she was paid the entire contract amount for 1,000 units of care. In 1991, Frey provided 735 units of care; again, she was paid for 1,000 units of care. Barbara Cannon, the county's emergency shelter care coordinator, had discussed with Frey Cannon's concern about Frey's ability to cope with the stress of emergency shelter care. Near the end of 1990, Cannon had noticed some improvement in Frey. Although Cannon had concerns about Frey's ability to provide shelter care, Cannon renewed Frey's contract because she wanted to give Frey an opportunity to prove herself.

3. Buoen's statement that nobody from the county ever contacted her regarding Frey's ability to provide shelter care is contradicted by a September 7, 1990, letter from Buoen in response to an inquiry from Barbara Cannon. Dr. Buoen states, "I believe [Frey] is emotionally stable at this time and is able to continue to provide emergency shelter services to children."

4. Frey further alleged the county had discriminated against her on the basis of her status with respect to receipt of public assistance. The trial court's dismissal of this claim has not been challenged on appeal.

"goes to pieces" two to three times a week since 1989 or 1990, and has been hospitalized for these panic attacks on an inpatient or emergency room basis. Although stress definitely triggers the panic attacks, sometimes they simply come "right out of the blue." In addition, having to deal with children, her own or foster children, triggers panic attacks. Before her hospitalization in October of 1991, Frey was unable to function well enough to care for the foster children who were sent to her and had to refuse to accept them. She would go a week at a time without bathing or changing clothes. During the time she was providing foster care, Frey was weeping a lot; she spent a lot of her time in bed, feeling despair and wishing she were dead.

Dr. Buoen's statements to Quella indicated that Frey should have been in day treatment long ago, that she had required inpatient psychiatric hospitalization three times in 1991 and that Frey has had suicidal ideation in the past. Dr. Buoen also noted that Frey's behavior has been severely affected by her anxiety, depression and tendency toward panic. According to Buoen's statements to Quella, "Currently, her condition is such that she would not be able to tolerate the ordinary day-to-day stress of working." Finally, Dr. Buoen noted that Frey's "condition and general level of functioning have been about pretty much the same since [June of 1990]."

According to Veronica Sletten, Frey was unable to continue working as of October 1989. Frey had been working as a home care giver for the county "and had been able to make a living at it up until [October 1989] although it was becoming more and more difficult for her." Sletten first noticed Frey's mental or emotional problems surfacing around 1984 or before. By late 1989, Sletten and Frey's two sisters were doing much of Frey's foster care work for her. In Sletten's mind, there was no question that Frey was unable to do her foster care work in October of 1989.

The Social Security Administration initially determined that Frey had been unable to work beginning June 1, 1990, but after Quella talked with Dr. Buoen and Veronica Sletten, the date of disability was revised to October 15, 1989. Frey received disability benefits from that date.

Based on documents from Frey's social security disability file, the county moved for summary judgment. Three days before hearing the county submitted additional documents from this file in support of the motion. The trial court considered the additional documents over Frey's objection that they were untimely.[5]

In granting the county's motion for summary judgment on all claims, the trial court held that it was appropriate to rely on after-acquired evidence obtained from Frey's social security disability file, and that the evidence demonstrated that Frey was not entitled to damages because she was not qualified to be an emergency shelter care provider. The court also granted summary judgment to the county on Frey's reprisal, public service discrimination, promissory estoppel, and intentional infliction of emotional distress claims.

### ISSUES

**I.** Did the trial court err in relying on evidence that the county acquired after it decided not to renew Frey's contract?

**II.** Did the trial court err in dismissing Frey's claim for intentional infliction of emotional distress?

**III.** Did the trial court err in holding the promissory estoppel doctrine inapplicable on the facts of the present case?

### ANALYSIS

#### Standard of Review

In reviewing a summary judgment, the appellate court must determine whether

---

5. The trial court held that these additional documents were timely served and filed as reply documents pursuant to Minn.R.Gen.Pract. 115.03(c). Frey contends that the trial court erred because these documents had, in fact, formed the basis of the summary judgment motion itself and could not qualify as reply documents. Frey conceded at the hearing, however, that she had not been prejudiced by the timing of the submission of these documents. We conclude, therefore, that the trial court did not abuse its discretion in considering them. See Minn.R.Gen.Pract. 1.02.

there are any genuine issues of material fact and whether the district court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). The facts must be viewed in the light most favorable to the party against whom summary judgment was granted. *Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn.1982). One of the functions of summary judgment is to dispose of insupportable claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## I. *After–Acquired Evidence*

The evidence contained in Frey's social security disability file was not available to the county at the time it decided not to renew Frey's contract. The trial court, however, relied on this evidence in concluding that Frey had not established a prima facie case of discrimination because she could not establish that she was a qualified disabled person.

### A. The Caselaw

Whether evidence acquired after termination of an employee can be used to justify the termination has been addressed by courts and administrative agencies since at least 1959. *See* Mitchell H. Rubinstein, *The Use of Predischarge Misconduct Discovered After an Employee's Termination as a Defense in Employment Litigation,* 24 Suffolk U.L.Rev. 1, 6 (1990) (hereinafter cited as Rubinstein) (citing *Southern Airways Co.,* 124 N.L.R.B. 749 (1959), *enforced in part, enforcement denied in part on other grounds,* 290 F.2d 519 (5th Cir.1961); *Robitzek v. Reliance Intercontinental Corp.,* 7 A.D.2d 407, 183 N.Y.S.2d 870 (1959), *aff'd,* 7 N.Y.2d 1041, 200 N.Y.S.2d 424, 167 N.E.2d 74 (1960)).

Use of after-acquired evidence to justify termination is frequently criticized on the grounds that the after-acquired evidence could not have been the reason for the termination. *See* Rubinstein, 24 Suffolk U.L.Rev. at 4. One commentator has suggested that after-acquired evidence should only be allowed to show that an employee was not qualified initially for the job. *Id.* at 4–5 (citing Morley Witus, *Defense of Wrongful*

*Discharge Suits Based on an Employee's Misrepresentations,* 69 Mich.B.J. 50, 51 (1990)).

The appellate courts of Minnesota have not addressed the issue of use of after-acquired evidence. A review of apparently conflicting case law on this issue will be helpful in determining whether the trial court erred in considering after-acquired evidence in this case.

In *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700 (10th Cir.1988), an employee, fired for "poor attitude, inability to get along with fellow employees and customers, and similar problems in dealing with the public and co-workers," brought suit alleging that he was, in fact, the victim of age and religious discrimination. *Id.* at 703. Nearly four years after the firing, the employer found over 100 instances of falsification of records; 18 of these falsifications occurred after the employee had returned to work from probationary status for falsifying records. The employee never denied the falsifications. *Id.* Summary judgment in favor of the employer was affirmed on appeal on the theory that since the employer properly could have fired Summers if it had known of his falsifications, there was no reason to inquire whether his religion played any role in the decision. *Id.* at 709.

The court in *Summers* cited with approval the rationale set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mount Healthy,* a school board gave two reasons for not rehiring a teacher. The lower courts awarded damages to the teacher, holding that one of the reasons given for not rehiring involved protected first amendment rights of the teacher. The United States Supreme Court reversed and remanded for further proceedings to determine whether the board could show that it would have reached the decision not to rehire on a permissible basis that did not involve protected First Amendment conduct. *Id.* at 287, 97 S.Ct. at 576.

In *Wallace v. Dunn Constr. Co.,* 968 F.2d 1174 (11th Cir.1992),[6] an employee sued after being fired for the stated reason of insubordination. During discovery, the employer learned that the employee had lied on her employment application by failing to disclose a drug possession conviction when asked whether she had ever been convicted of a crime. The Eleventh Circuit affirmed the district court's grant of partial summary judgment to the employer on issues of the employee's reinstatement, front pay and injunctive relief, but found that the issues of back pay, lost wages and liquidated damages were not ripe for summary judgment. In ruling that the employee could proceed to trial on these issues, the court rejected the *Summers* holding as an unwarranted extension of the holding in *Mount Healthy:*

> Whereas the *Mount Healthy* rule excuses all liability based on what *actually* would have happened absent the unlawful motive, the *Summers* rule goes one step further: it excuses all liability based on what *hypothetically* would have occurred absent the alleged discriminatory motive *assuming the employer had knowledge that it would not acquire until sometime during the litigation arising from the discharge.* In doing so, the *Summers* rule clashes with the *Mount Healthy* principle (adapted for use in statutory discrimination cases) that the plaintiff should be left in no worse a position than if she had not been a member of a protected class or engaged in protected opposition to an unlawful employment practice.

*Id.* at 1179 (emphasis in original).

The *Wallace* court's primary disagreement with the rule in *Summers* is that it

> does not encourage employers to eliminate discrimination. Rather, it invites employers to establish ludicrously low thresholds for "legitimate" termination and to devote fewer resources to preventing discrimination because *Summers* gives them the option to escape all liability by rummaging through an unlawfully-discharged employee's background for flaws and then manufacturing a "legitimate" reason for the dis-

charge that fits the flaws in the employee's background.

*Id.* at 1180.

The dissent in *Wallace,* in urging summary judgment for the employer on all issues, makes, we believe, a critical distinction between the facts in *Summers* and those in *Wallace:*

> This fraud-in-application case must be distinguished from that of an employee who has properly come into the status of employee and, during employment, commits misconduct that is discovered by the employer after it is sued for employment discrimination, and the misconduct is then asserted as a defense on the ground employer would have fired the employee had it known of the wrong.

*Id.* at 1185 (Godbold, J., dissenting).

Critical distinctions may be made, in fact, in three categories of cases: In the first category are cases in which an employee, although initially qualified for the job, commits misconduct which would justify termination regardless of whether the actual reason for discharge was discriminatory. *Summers* was such a case.

Second, an employee may commit misconduct by lying on or submitting a fraudulent resumé when applying for a job. *Wallace* was such a case, although the majority (without making the distinction between the *Summers* facts and those in *Wallace* as did the *Wallace* dissenter) found fact issues remaining. The better view, we believe, is that if the employee would not have been hired without the lie or fraud, refusal to allow the employee to profit from that misconduct is proper. *See Sweeney v. U–Haul Co. of Chicago Metroplex,* 55 E.P.D. ¶ 40,598, 1991 WL 1707 (N.D.Ill.1991). The very act of dishonesty in completing an employment application may bar a claim that a refusal to hire was discriminatory. *See Village of Oak Lawn v. Human Rights Comm'n,* 133 Ill. App.3d 221, 88 Ill.Dec. 507, 509, 478 N.E.2d 1115, 1117 (1985) (applicant's misrepresentations regarding medical history and marital status demonstrated lack of trustworthiness, honesty, integrity and good judgment neces-

---

**6.** A motion for rehearing en banc is pending in *Wallace.*

sary to be a police officer; applicant could not establish prima facie case of discrimination, and even if she could, employer showed legitimate nondiscriminatory reason for refusal to hire).

A third category of cases involves claims of discriminatory failure to hire. Such a claim may be precluded if an applicant for employment engaged in conduct before applying that would disqualify the applicant from employment. *See Smallwood v. United Air Lines, Inc.*, 728 F.2d 614 (4th Cir.1984), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984). In *Smallwood*, a job applicant had been terminated from his previous employment for wrongfully billing his employer for flights taken by his children and for moving expenses. The court in *Smallwood* considered the circumstances of the applicant's termination from previous employment, unknown at the time his application was rejected, and concluded that there was only one possible resolution in that case: the applicant would not have been hired, regardless of any age discrimination, where his honesty and integrity had been demonstrated to be lacking. *Id.* at 627.

In *Murnane v. American Airlines, Inc.*, 482 F.Supp. 135, 148–51 (D.C.1979), *aff'd*, 667 F.2d 98 (D.C.Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982), the court considered conduct of the applicant occurring *after* the alleged discriminatory failure to hire. After his rejection by American Airlines, Murnane was hired by two other airlines, both of which discharged him (the first for failure to become FAA certified; the second for demonstrating an inability to perform even basic procedures). The court found that American would never have hired Murnane even if his application had gone beyond the first stage of the selection process. *Id.* at 150–51, 153 ("Clearly, * * * plaintiff was *never* competitively qualified, at any age, for the position at American which he sought") (emphasis in original).

### B. Contract

■ When an employee has obtained employment by lying or withholding information in the application process, a contract analysis is useful. *See* Witus, 69 Mich.B.J. at 51. The employer's agreement to employ an indi-vidual, having been obtained by fraud, is voidable at the employer's option, and the employee cannot claim any rights against the employer. *See id.*

Application of the contract analysis set forth by Witus to the facts of this case leads to the conclusion that Frey cannot prevail against the county. Had the county known in 1990, when it contracted with Frey for provision of emergency care for children, that she was not qualified to provide such services, she would never have received any emergency shelter care contracts. As with the employee in *Wallace*, Frey was not entitled to what she now claims was wrongfully taken from her. *See Wallace*, 968 F.2d at 1187–88 (Godbold, J., dissenting). The county properly would have terminated Frey's contract immediately upon learning that she was incapable of performing her contract satisfactorily.

### C. Standing

■ The after-acquired evidence involved in this case, we believe, also presents a question of standing to maintain suit. *See id.* at 1185 (Godbold, J., dissenting). According to the unrefuted evidence presented by the county, if Frey's medical condition, as disclosed in her social security disability file, had been known to the county in 1989, Frey would never have received a contract to be an emergency shelter care provider. Therefore, Frey has not been damaged by the termination. In an analogous situation, this court has held that a white couple who did not comply with the statutory requirements for becoming adoptive parents could not challenge a county's policy of same race adoptive placements. *Carlson v. County of Hennepin*, 428 N.W.2d 453, 456–67 (Minn.App. 1988), *pet. for rev. denied* (Minn. Oct. 10, 1988), *cert. denied*, 490 U.S. 1023, 109 S.Ct. 1751, 104 L.Ed.2d 187 (1989).

Like the white couple in *Carlson*, Frey lacks standing to pursue her claim because she has suffered no damages. The couple in *Carlson*, who were not qualified to be adoptive parents, could not complain that Hennepin County did not allow them to adopt a child. Similarly, Frey, who would not have received a contract if the county had been

aware of the disability portrayed in her social security disability file, cannot complain that her contract was terminated. *See Dotson v. United States Postal Serv.,* 794 F.Supp. 654, 659 (E.D.Mich.1991) ("[Plaintiff] cannot seek recovery for discrimination when he was not initially entitled to the job."), *aff'd,* 977 F.2d 976, 978 (6th Cir.1992) ("post-termination evidence of plaintiff's application fraud is relevant to his claim of injury, and 'precludes the grant of any present relief or remedy.'") (quoting *Summers,* 864 F.2d at 708), *cert. denied,* —— U.S. ——, 113 S.Ct. 263, 121 L.Ed.2d 193 (1992).

We emphasize that this is not a case like *Summers,* in which the employee was originally qualified for the position, but later committed misconduct that would have justified termination if the employer had known of it. *See O'Day v. McDonnell Douglas Helicopter Co.,* 784 F.Supp. 1466, 1468 (D.Ariz.1992) (employee's misconduct in photocopying and distributing confidential files bars claim for wrongful termination and age discrimination). We share the concerns of the *Wallace* court regarding the mischief that may occur if an employer, having discriminatorily discharged a once-qualified employee, is permitted to rummage through employment records to uncover a "nondiscriminatory" reason for discharge. In making a distinction between the facts of *Summers* and the facts of *Wallace,* we answer here the question before us and hold only that an employer can rely on evidence that an employee was not entitled initially to employment and received employment only by failing to disclose material facts regarding her qualifications for the position sought.

### D. Additional Considerations

We believe public policy considerations also support our adoption of this rule. The county is entitled to limit its foster care contracts to individuals who are qualified to perform the duties of a foster care provider. The providers are entrusted with the care of children for whom the county is responsible. Placements may occur at any time of the day or night. The county has a right to insist that its providers have the stamina and vigor necessary to meet the arduous job of emergency shelter care provider. Furthermore, the county has a right to protect itself against claims that its negligence in contracting with an unqualified provider has caused harm to a child placed in that provider's care or to a third party.

We believe that our decision in this case is consistent with the holding in *Jewison v. Frerichs Constr.,* 434 N.W.2d 259 (Minn. 1989), where the court determined that a false representation regarding health or physical condition by an employee will bar recovery of workers' compensation benefits if: (1) the false representation was made knowingly and willfully; (2) the employer substantially and justifiably relied on the false representation in hiring the employee; and (3) there is a causal connection between the false representation and the employee's injury. *Id.* at 261. While we do not intend that the *Jewison* rule should be extended to cases other than those involving workers' compensation,[7] it is apparent that an unqualified applicant for employment cannot establish the requisite causal connection between discriminatory conduct and the resulting harm. *See Patterson v. Greenwood Sch. Dist. 50,* 696 F.2d 293, 295 (4th Cir.1982).

While the evidence contained in Frey's social security disability file is uncontested, and, therefore, supports the trial court's award of summary judgment, Frey argues that her statements to the Social Security Administration in 1991 merely echoed what the county had told her when explaining to her that the emergency shelter care contract would not be renewed. Granting credence to Frey's attestations, however, would require us to ignore the statements from her mother and her treating psychiatrist, which demonstrate dramatically Frey's inability to provide emergency child care. In addition, although Dr. Buoen states in her affidavit that Frey suffered serious emotional injury as a result of the county's refusal to renew her contract, Frey does not deny that the 1989 and 1990 behavior described in her social security disability file occurred. According to file records, Frey spent her days sitting at the

---

7. *See* Rubinstein, 24 Suffolk U.L.Rev. at 5 (the holding of *Jewison,* known as the "Larson rule,"

has never been applied in employment law cases).

kitchen table "just trying to survive." Frey has stated that during the entire time she was performing emergency shelter care work, the children were in charge of the house. Of importance also is that despite her protestations that in applying for social security disability benefits she merely repeated what the county stated to her, Frey has kept all social security disability benefits that were awarded retroactive to October of 1989 and has made no overtures to return those benefits. Returning or disclaiming these benefits would be consistent with the position she takes in this litigation.

Finally, Frey argues that a determination that she is disabled for purposes of receiving social security disability does not mean she is incapable of providing emergency shelter care. She states that there were never any complaints about her work, and even after the county decided not to renew her contract for emergency shelter care, the county offered to allow her to do other, less stressful, foster care. The absence of complaints, however, demonstrates no more than that Frey's parents, her sisters and her husband were able to provide the foster care for which Frey had contracted. Furthermore, even an employee who has an exemplary work record may not be qualified for employment. *See Doe v. Region 13 Mental Health–Mental Retardation Comm'n,* 704 F.2d 1402, 1409–12 (5th Cir.1983) (psychiatric worker who had exemplary work and attendance records was not an "otherwise qualified" handicapped person; her mental illness, including suicidal statements and at least one "serious attempt" at suicide, might convey bias in favor of suicide to her patients). The county was under the mistaken belief that Frey was qualified to be a foster care provider when it offered to allow her to continue in a less stressful program. The evidence plainly establishes that Frey was not harmed by the termination of a contract she would not have had if the county had been aware of her actual condition.

### E. Frey's Other Claims

Our decision that the trial court appropriately considered after-acquired evidence of Frey's nonqualification for employment in awarding summary judgment to the county is determinative of her claims that she is a qualified disabled person, that she was discriminatorily denied access to a public service and that the county failed to "reasonably accommodate" her disability. Brief analysis of these claims, however, will be helpful in demonstrating the interrelationship of these issues.

To establish the first step in the *McDonnell Douglas* analysis, Frey must show that (1) she is a member of a protected class; (2) *she was qualified for opportunities that the county was making available to others;* (3) despite her qualifications, she was denied the opportunities; and, finally, (4) after the opportunities were denied to Frey, the opportunities either remained available or were given to someone else. *State by Khalifa v. Hennepin County,* 420 N.W.2d 634, 640 (Minn.App.1988), *pet. for rev. denied* (Minn. May 4, 1988).

The county, in arguing that Frey could not establish the second step in the *McDonnell Douglas* analysis because she could not show she was qualified to be an emergency shelter care provider, relies in part on the after-acquired evidence of Frey's social security disability file. We believe that reliance is sound. While the court in *Summers* treated the *McDonnell Douglas* analysis and the after-acquired evidence issues as separate, *Summers,* 864 F.2d at 705 ("*McDonnell Douglas* clearly presupposes a 'legitimate, nondiscriminatory reason' *known* to the employer at the time of the employee's discharge") (emphasis in original), this case is factually distinguishable from *Summers.* We are unable to separate the after-acquired evidence analysis from the *McDonnell Douglas* analysis under the facts here. Use of after-acquired evidence to establish an alternative reason for terminating an employee who was once qualified for the position is different from the discovery during litigation that an employee was never qualified for the position, should never have been hired, and only obtained the position by misleading the employer. *See Wallace,* 968 F.2d at 1189 (Godbold, J., dissenting). As discussed earlier, Frey was not qualified to be an emergency shelter care provider. For the same rea-

sons Frey lacks standing to pursue her claim, she cannot establish a prima facie case.

Frey's argument that the county discriminated against her in access to a public service in violation of Minn.Stat. § 363.03, subd. 4 (1990) also must fail. Even if we disagreed with the trial court's finding that the foster care program is not a public service as to its contracting providers, and even if Frey had standing to pursue her claim, the Human Rights Act, Minn.Stat. § 363.03, subd. 8a (1990), would prevent her recovery. That section of the act, which prohibits discrimination in contracting, was adopted after section 363.03, subd. 4 and is more specific; therefore, subdivision 8a, rather than subdivision 4, applies. *See* Minn.Stat. § 645.26, subd. 4 (1990) ("the law latest in date of final enactment shall prevail"). Under section 363.03, subd. 8a, the county is not liable for the nonrenewal of Frey's contract if it can show a legitimate business purpose for the nonrenewal. The county has made the requisite showing; it is not obligated to renew a contract with an unqualified provider.

To establish a claim for reasonable accommodation discrimination, Frey must show that she is a qualified disabled person; that her disability was known to the county; and that the county failed to make reasonable accommodation for her disability. Minn.Stat. § 363.03, subd. 1(6) (1990). Frey cannot establish that she is a qualified disabled person, and summary judgment on this claim was proper.

## II. *Intentional Infliction of Emotional Distress*

■ In asserting a claim for intentional infliction of emotional distress, Frey must establish: (1) the conduct that causes the emotional distress must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) finally, the emotional distress must be severe. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn.1983).

■ If severe emotional distress results, but the distress is exaggerated compared to what a reasonable person would experience, the defendant is not liable unless the defendant was aware that the plaintiff was particularly susceptible to such distress. *Cafferty v. Garcia's of Scottsdale, Inc.*, 375 N.W.2d 850, 854 (Minn.App.1985).

In this case, taking the county's conduct at its worst, Mary Jo Hassel decided not to renew Frey's contract because of Hassel's ignorance and fear regarding Frey's diabetes.[8] Assuming that the county's conduct was extreme and outrageous, Frey's emotional distress was far greater than would be expected. Hospitalization is an extreme reaction to the conduct allegedly committed. There is no evidence that the county was aware of Frey's particular susceptibility to emotional distress. In fact, it was not until the county reviewed Frey's social security disability file that it would be reasonable to expect the county to be aware of Frey's mental health problems. The trial court properly awarded summary judgment on this claim.

## III. *Promissory Estoppel*

■ According to Frey, promissory estoppel should be invoked against the county because the county assured her that she could expect permanent employment as a shelter care worker, and, based on these assurances, Frey and her husband made extensive renovations to their house and purchased a $20,000 van.

■ Estoppel is

an equitable doctrine addressed to the discretion of the court and * * * intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights. To establish a claim of estoppel, plaintiff must prove that defendant made representations or inducements, upon which plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed.

*Northern Petrochemical Co. v. United States Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979), *quoted in Brown v. Minnesota Dep't of Pub. Welfare*, 368 N.W.2d 906, 910 (Minn. 1985).

---

8. Accepting this version of the county's actions ignores the fact that Hassel supervises two shel-ter providers who are diabetic, one of whom was hired after Frey's contract was not renewed.

The doctrine of promissory estoppel will operate to imply a contract in law where none exists in fact. *Del Hayes & Sons, Inc. v. Mitchell*, 304 Minn. 275, 283, 230 N.W.2d 588, 593 (1975). In this case, there was a contract, and the doctrine of promissory estoppel is inapplicable.

## DECISION

Frey was not qualified to be an emergency shelter care provider. As a result, she lacks standing to contend that the county's nonrenewal of her contract was wrongful. Frey's intentional infliction and estoppel arguments are unsustainable.

**Affirmed.**