834 F.2d 1248
 Tom BRENNAN, Plaintiff-Appellant,
v.
Wanda F. STEWART, Individually and as Executive Director of
the Texas Board of Examiners in the Fitting and
Dispensing of Hearing Aids, et al.,
Defendants- Appellees.
 No. 86-2972.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 7, 1988.
 
 Carol Marion, Larry R. Daves, Tyler, Tex., for plaintiff-appellant.
 George Warner, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before WRIGHT,* GEE, and JOLLY, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Appellant Tom Brennan, his application for a temporary training permit rejected by the Texas Board of Examiners in the Fitting and Dispensing of Hearing Aids because of a visual handicap, sued the members of the Board in federal court, alleging that their actions violated his constitutional and statutory rights and requesting damages and other relief. The district court dismissed his claims as barred by the Eleventh Amendment and the qualified immunity of the members of the Board. We reject Mr. Brennan's constitutional claims, but remand certain of his statutory claims for further proceedings.
 
 A. Facts and Prior Proceedings
 
 2
 The State of Texas regulates the hearing aid business through the Texas Board of Examiners in the Fitting and Dispensing of Hearing Aids. See Tex.Rev.Civ.Stat.Ann. art. 4566-1.01 et seq. (Vernon 1987). The Board is authorized to create and administer a licensing examination to persons "desiring to engage in fitting and dispensing hearing aids in the State of Texas." Art. 4566-1.06. The Board issues "temporary training permits" to persons who meet certain requirements, including the requirements for taking the licensing exam.[1] By regulation, the Board requires each applicant to complete a specified training regimen under a temporary permit or to have equal amounts of supervised practical experience before taking the licensing exam. See 22 Tex.Admin.Code Sec. 141.36(b) (minimum practical experience of 150 hours of training before examination); Sec. 141.35(b) (temporary training regime includes 150 hours of practical training). Holders of temporary permits must complete 15 hours of "ear mold impressions and otoscopic examinations of the ear." Sec. 141.35(b)(1)(E).
 
 
 3
 When he applied to the Board for a temporary training permit, Tom Brennan was a graduate of Stephen F. Austin University with a bachelor of science degree in psychology and social and rehabilitation services; he was enrolled in (and has since completed) a masters program in speech and language from the same university; and he was employed at the Nachogdoches Hearing, Speech, and Language Center as an aid. Mr. Brennan is totally blind.
 
 
 4
 The Board denied Mr. Brennan's application. According to a letter from Executive Director Wanda Stewart to his putative training supervisor:[2]
 
 
 5
 The decision of the Board was based on the fact that Mr. Brennan's visual disability will prevent him from complying with Rule and Regulation 141.35(E) [sic; 22 Tex.Admin.Code Sec. 141.35(b)(1)(E) ] which requires fifteen hours of ear impressions and otoscopic examinations. The rule requires that the fifteen hours be physically performed by the trainee himself. The Board cannot make exceptions to the rule and this decision is final.
 
 
 6
 Despite this apparently unqualified rejection, Ms. Stewart went on in the same letter to give the time and location of the next Board meeting and to assert that "Mr. Brennan is welcome to appear before the Board at this meeting if he so desires." Mr. Brennan did not respond; instead, after delaying about six months, he wrote to a Texas Assistant Attorney General requesting reconsideration of the Board's decision. Although the Assistant Attorney General's response did not satisfy him, he sought no judicial review under state administrative law.
 
 
 7
 Mr. Brennan then filed this federal action against the Board members in their official and individual capacities. He alleged that the Board's denial of the training permit on the basis of his visual handicap violated his right to equal protection and due process of law under the Fourteenth Amendment and 42 U.S.C. Sec. 1983, violated his rights under Sec. 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, and Sec. 122(a) of the Fiscal Assistance to State and Local Governments Act, 31 U.S.C. Sec. 6716(b)(2), and violated Texas anti-discrimination laws. He prayed for declaratory relief, temporary and permanent injunctions, and damages.
 
 
 8
 The district court held that the suit against the Board members in their official capacities was against the Board itself, and that the Board was an arm of the State of Texas. It therefore dismissed Mr. Brennan's Sec. 1983/Fourteenth Amendment and Sec. 504 claims against the Board members in their official capacities as barred by the Eleventh Amendment. In addition, the court dismissed Mr. Brennan's state-law claims as barred by the Eleventh Amendment and Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); and the court dismissed his claim under 31 U.S.C. Sec. 6716(b)(2) for failure to exhaust administrative remedies. The court granted Mr. Brennan leave to amend his complaint to allege with the particularity required by Elliott v. Perez, 751 F.2d 1472 (5th Cir.1985), violations of his rights under the Fourteenth Amendment and Sec. 504 by the defendants in their individual capacities. After reviewing the amended complaint, the district court held that the individual defendants had not violated Mr. Brennan's federal rights, and that even if they had, they were entitled to qualified immunity because they had not violated any clearly established rights. Mr. Brennan appeals only the district court's dismissal of his Fourteenth Amendment and Sec. 504 claims.
 
 
 9
 B. Through a Glass Darkly: Mysteries of the Eleventh Amendment
 
 
 10
 The district court held that Mr. Brennan's due process and equal protection claims and his claim under Sec. 504 of the Rehabilitation Act brought under Sec. 1983 against the members of the Board in their official capacities were barred by the Eleventh Amendment. Read literally, the Eleventh Amendment shields the states from suits by non-citizens only,[3] but the Supreme Court has construed it in light of a broader notion of sovereign immunity implicit in the constitutional scheme. See Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); see also Welch v. Dept. of Highways & Public Transportation, --- U.S. ----, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (plurality opinion). Although Congress can abrogate the Eleventh Amendment by statute under the authority of Sec. 5 of the Fourteenth Amendment,[4] Sec. 1983 itself does not abrogate the states' immunity from suit in federal court. Edelman v. Jordan, 415 U.S. 651, 675-76, 94 S.Ct. 1347, 1361-62, 39 L.Ed.2d 662 (1979). Mr. Brennan does not dispute that his official capacity claims were in fact against the Board itself, nor does he argue that the Board is not an arm of the state. He now concedes that his claim for damages is barred by the Eleventh Amendment. Even so, he argues that the district court erred by refusing to apply the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to reach the merits of his claims against the Board for declaratory and injunctive relief.
 
 
 11
 Mr. Brennan is correct. The district court should have entertained his claims for equitable relief on the merits. See Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) ("[I]mplementations of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State. See Ex parte Young."); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984) (Ex parte Young fiction applies only to violations of federal law by state officials); Quern v. Jordan, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979) (Eleventh Amendment bars all but prospective relief and costs ancillary to prospective relief under Ex parte Young ); see also Darlak v. Bobear, 814 F.2d 1055, 1060-61 (5th Cir.1987); Clay v. Texas Women's University, 728 F.2d 714, 715-16 (5th Cir.1984).
 
 
 12
 The Ex parte Young fiction is that acts by state officials which are contrary to federal law cannot have been authorized or be ratified by the state; thus, illegal acts by state officials cannot be considered acts done under the state's authority. Therefore, any suit seeking to enjoin wrongful--and ipso facto unauthorized--acts by state officials is not a suit against the state; and the federal court's injunction of those wrongful acts is not a judgment against the state itself. The "fiction" of Ex parte Young is its underlying image of the state as a discrete entity separate from its agents, ready and willing to obey federal law under the Supremacy Clause but thwarted by the bad acts of its recalcitrant officials; whatever the power of this image, the fiction has long been thought "necessary to preserve the supremacy of federal law." Clark, The Role of National Courts in 200 Years of Evolving Governance, 18 Cum.L.Rev. 95, 107 (1987). Ex parte Young creates "the well-recognized irony that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment." Pennhurst, 465 U.S. at 105, 104 S.Ct. at 910 (internal quotation omitted). Although the Supreme Court has sometimes implied otherwise,[5] Ex parte Young is a gaping hole in the shield of sovereign immunity created by the Eleventh Amendment and the Supreme Court.[6]
 
 
 13
 The Eleventh Amendment and the doctrine of Ex parte Young together create a relatively simple rule of state immunity. Basically, prospective injunctive or declaratory relief against a state is permitted--whatever its financial side-effects--but retrospective relief in the form of a money judgment in compensation for past wrongs--no matter how small--is barred. The Ex parte Young fiction is usually quite easy to apply. In this case, for example, the district court should have dismissed the official-capacity damage claims but retained jurisdiction over the official-capacity equitable ones.
 
 
 14
 But the district court's miscue in this case also demonstrates that the interaction of the Eleventh Amendment with Ex parte Young continues to confound lawyers and judges alike. At least part of the problem is that the Supreme Court shifts between formalistic recitations of Eleventh Amendment dogma without acknowledging Ex parte Young even in a footnote and ruling on the merits of dozens of cases under the Ex parte Young fiction without mentioning the Eleventh Amendment issue even in passing. Compare Atascadero State Hospital v. Scanlon, 473 U.S. 234, 235, 105 S.Ct. 3142, 3144, 87 L.Ed.2d 171 (1985) (holding in categorical terms that Sec. 504 does not abrogate Eleventh Amendment while carefully limiting the question presented to "retroactive monetary relief"; no mention of Ex parte Young ); Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam) (granting certiorari to delete state from list of party defendants without noting undoubted propriety of underlying injunctive relief against the state under Ex parte Young fiction);[7] with Turner v. Safley, --- U.S. ----, ----, 107 S.Ct. 2254, 2257, 96 L.Ed.2d 64 (1987) (reaching merits of suit challenging state prison regulations described as a "class action for injunctive relief and damages " (emphasis added)); see also cases cited supra note 6.
 
 
 15
 In addition, the confusion is compounded by frequent decisions, offered without explanation, of cases that appear to be barred by the Eleventh Amendment. For example, in Ortega v. O'Connor, 764 F.2d 703 (9th Cir.1985), the Ninth Circuit granted summary judgment for the plaintiff in his suit against a California state hospital[8] under Sec. 1983 and the Fourth Amendment, remanding for an assessment of damages. The suit was clearly against the state and not against its officials in their individual capacities: the court made no mention of qualified immunity, the customary burning issue in individual capacity cases; and the plaintiff's pendent state-law claims were dismissed for failure to comply with the California Tort Claims Act. But on certiorari the Supreme Court decided the case on the merits, despite the fact that the only relief requested by the plaintiff was retrospective money damages. O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).
 
 
 16
 Also, two out of three leading Supreme Court cases in the "constitutional tort"/due process area appear to have been barred by the Eleventh Amendment. In Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), a prisoner sued under Sec. 1983 for damages in the amount of $23.50, the price of a hobby kit negligently lost by state prison officials. The suit may have been against the officials in their individual capacities, but if so it is odd that their undoubted qualified immunity was not raised. Parratt was modified by the companion cases of Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), both of which were suits under Sec. 1983 for damages. Daniels was a suit against the officials of a city jail, but Davidson was a suit against state prison officials. Again, Davidson obviously was a close case; but neither the Supreme Court decision nor the Third Circuit opinion mentioned the normally dispositive qualified immunity rule of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). See Davidson v. O'Lone, 752 F.2d 817 (3d Cir.1984) (en banc). In other words, both Parratt and Davidson appear to be suits for money damages against state officials in their official capacities.
 
 
 17
 Or again, in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court confronted the problem of the relation between Sec. 1983 and habeas relief in a suit by inmates against state prison officials. In Wolff,
 
 
 18
 the Court held that inmates who claimed in a class action that good-time credits had been taken from them without proper procedural protections could sue for damages and an injunction under Sec. 1983 even though their claim seeking restoration of lost good-time for which they had previously been credited could be pursued only through a petition for a writ of habeas corpus.
 
 
 19
 Serio v. Members of Louisiana State Bd. of Pardons, 821 F.2d 1112, 1115 (5th Cir.1987) (emphasis added). The Supreme Court explicitly relied on the existence of the prisoners' damages claims for past wrongs--undoubtedly barred by the Eleventh Amendment--in determining that 28 U.S.C. Sec. 2254 and its exhaustion requirements did not bar immediate Sec. 1983 relief; the Court mentioned the proper theory--Ex parte Young injunctive relief--almost as an afterthought.[9]
 
 
 20
 These cases may mean no more than that the Supreme Court will not raise the Eleventh Amendment bar sua sponte--in other words, that a state can waive its immunity by unqualified participation in litigation. Inconveniently for this view, however, the Court itself has stated the converse as the proper rule. See Pennhurst, 465 U.S. at 121, 104 S.Ct. at 919 ("A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment."); Edelman v. Jordan, 415 U.S. at 678, 94 S.Ct. at 1363 ("the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court ..."). Given all these curious inconsistencies, it is no wonder that lawyers and judges are still confused about the Eleventh Amendment and the doctrine of Ex parte Young.
 
 
 21
 The district court's jurisdictional dismissal of Mr. Brennan's claims for injunctive relief was error. "When the basis of federal jurisdiction is intertwined with the plaintiff's federal cause of action, the court should assume jurisdiction over the case and decide it on the merits." Eubanks v. McCotter, 802 F.2d 790, 792-93 (5th Cir.1986). Jurisdiction over a claim for equitable relief under Ex parte Young grounded on the "federal question" statute 28 U.S.C. Sec. 1331 is usually intertwined with the merits.[10] Therefore, unless the suit "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous," Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), a federal court always has jurisdiction of a suit seeking to enjoin state officials from violating federal law. If the officials are not violating federal law, judgment should be entered for the defendants on the merits.
 
 
 22
 In some cases improper jurisdictional dismissals force us to reverse and remand to allow the district court to consider the merits. See, e.g., Eubanks, 802 F.2d at 794. In this case, however, the district court considered the merits of the constitutional claims (but not the Sec. 504 claims) when ruling on Mr. Brennan's suit against members of the Board in their individual capacities. Since "[r]eversal is inappropriate if the district court can be affirmed on alternative grounds," Leonard v. Dixie Well Service & Supply, Inc., 828 F.2d 291, 294 (5th Cir.1987), we proceed to review the merits of Mr. Brennan's claims to see whether any of them warrant remand to the district court for further proceedings.
 
 
 23
 C. Constitutional Limits on the Power of the Board
 
 
 24
 Mr. Brennan does not complain about the procedures used by members of the Board in deciding to deny his application for a license. He argues instead that the Board's decision was wrong; in fact, he argues that the decision was so utterly wrong that it can be reversed by a federal court reviewing it under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[11]
 
 1. The Framework of Rights
 
 25
 a. "Substantive" Due Process
 
 
 26
 Mr. Brennan's due process claim is one form of several interrelated constitutional doctrines that courts and commentators have oxymoronically labeled "substantive" due process. The conceptual essence of "substantive" due process is the notion that the Due Process Clause--in addition to setting procedural minima for deprivations of life, liberty, or property--bars outright "certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). The Supreme Court has never advanced a rigorous theoretical framework for the classification and analysis of all "substantive" due process claims, but the interrelated strands of the doctrine are relatively clear.
 
 
 27
 One form of "substantive" due process is the substantive protections in the Bill of Rights that have been "incorporated" into the Fourteenth Amendment to limit the power of the states. See, e.g., Brown v. Texas A & M University, 804 F.2d 327, 336 (5th Cir.1986) (free speech claim by government employee described as a "claim alleging a violation of Substantive Due Process under the First and Fourteenth Amendments"). While it would be more conceptually elegant to think of these substantive rights as "privileges or immunities of citizens of the United States," U.S. Const. amend. XIV, rather than as deprivations of liberty or property without due process of law,[12] as a matter of doctrinal history the "selective" incorporation of the Bill of Rights has proceeded under the theory that those substantive rights "implicit in the concept of ordered liberty"[13] (and only those rights) are protected against state intrusion by the Due Process Clause. Another form of "substantive" due process is the judicial ban on laws[14] or actions by government officials[15] that "shock the conscience" and thus fall outside the bounds of legitimate governmental activity.
 
 
 28
 The Due Process Clause also requires that the states act only through means appropriately related to legitimate ends. This strand of the "substantive" due process doctrine itself is composed of two parts: rationality limitations and normative limitations on government power. Every law or governmental act must be reasonably related to its end, and thus not "arbitrary." See Regents of University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (state university's dismissal of student was not arbitrary); Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 124-25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (regulation of retail gasoline market found rational). Certain laws or actions are unconstitutional, however, even if rationally related to the state's purposes or ends. One historical manifestation of this normative limitation on state power was simply to declare certain ends illegitimate. See, e.g., Lochner v. New York, 198 U.S. 45, 57, 25 S.Ct. 539, 543, 49 L.Ed. 937 (1905) (states may not restrict freedom of contract under guise of labor law). But the modern technique has been to require a "compelling" state interest reflected in laws[16] that are "narrowly drawn to express only the legitimate state interests at stake." Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973); cf. Lochner, 198 U.S. at 58-59, 25 S.Ct. at 543-44 (justification based on legitimate end of protecting workers' health was inadequate because there must be "a more direct relation, as a means to an end, ... before an act can be held to be valid which interferes with [freedom of contract]"). This normative limitation, whose requirement of a tight "fit" between means and ends was imported from the "strict scrutiny" approach of modern equal protection law,[17] "is 'strict' in theory but usually 'fatal' in fact." Bernal v. Fainter, 467 U.S. 216, 219 n. 6, 104 S.Ct. 2312, 2315 n. 6, 81 L.Ed.2d 175 (1984) (quoting Gunther, The Supreme Court, 1971 Term--Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 8 (1972)).
 
 
 29
 The strands of "substantive" due process can be conceptually distinguished but they are intertwined. Every action by government must be rationally related to its end, and ends that "shock the conscience" or otherwise violate the norms "implicit in the concept of ordered liberty" are illegitimate. Even arguably legitimate state ends can be met only by means that do not impinge on certain individual rights deemed "fundamental" by the federal judiciary, and thus certain legitimate state ends cannot be reached in accordance with "the concept of ordered liberty." Even "rationality" review is a kind of normative limitation, albeit an uncontroversial one, since there is only good reason and no logical necessity for deriving a constitutional right to be free of bad decisions from a guarantee of good process.
 
 
 30
 In this case, Mr. Brennan does not argue that the actions of the Board "shock the conscience" or violate any protections afforded him indirectly by the Bill of Rights; rather, his contentions focus on the means/ends strand of "substantive" due process doctrine. Mr. Brennan's attack is based solely on the universal requirement of rationality in government action: He acknowledges that we should not "strictly scrutinize" the Board's decision because there is no "fundamental" right at stake; he asserts, nevertheless, that the Board's decision to deny him a training permit violated his rights to "substantive" due process because it was arbitrary and irrational.
 
 
 31
 b. Equal Protection of the Laws
 
 
 32
 The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (laws aimed at mentally retarded do not create a "suspect classification"; but zoning restrictions on homes for mentally retarded persons are irrational since all asserted reasons for the restrictions apply equally to non-restricted group homes). Mr. Brennan acknowledges that under the reasoning of City of Cleburne "strict" or "heightened" scrutiny is not appropriate for state discriminations based on his visual handicap; he contends, however, that faithfulness to City of Cleburne requires that we put teeth in the usually toothless examination of the rationality of the state's classification. He asserts that under City of Cleburne 's less deferential standard there is no rational relationship between any legitimate state interest and the Board's decision to deny him a temporary training permit.
 
 
 33
 c. The Relationship Between "Substantive" Due Process and Equal Protection
 
 
 34
 In the absence of a "fundamental" right or a "suspect classification," both Mr. Brennan's "substantive" due process and his equal protection claims result in some sort of rationality review. Is there any reason to distinguish further between the kind of review available under these two distinct provisions of the Fourteenth Amendment?
 
 
 35
 There are differences between the two constitutional protections. A violation of "substantive" due process, for example, occurs only when the government deprives someone of liberty or property; or, to use the current jargon, only when the government "works a deprivation" of a "constitutionally protected interest." See Regents of University of Michigan v. Ewing, 474 U.S. at 223 & n. 8, 106 S.Ct. at 512 & n. 8 (assuming arguendo that plaintiff had a protected property interest before considering "substantive" due process claim). No such deprivation of liberty or property is required for a violation of the Equal Protection Clause. On the other hand, a violation of equal protection occurs only when the government treats someone differently than others similarly situated; if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action--even if irrational--does not deny them equal protection of the laws. See Arceneaux v. Treen, 671 F.2d 128, 137 (5th Cir.1982) (Goldberg, J., concurring) (rationality review employed by majority inappropriate; no equal protection problem at all with apparently foolish law because plaintiffs have not alleged any group that gets unequal treatment from it). Violations of "substantive" due process, on the other hand, occur when the government treats someone irrationally, even if it treats everyone that way. Cf. Exxon Corp., 437 U.S. at 124-25, 98 S.Ct. at 2213 (plaintiffs raised only "substantive" due process claims, since similarly situated persons all treated the same).
 
 
 36
 In this case the plaintiff has alleged that he has a property interest in the temporary training permit created by certain mandatory language in the statute, see Tex.Rev.Civ.Stat.Ann. art. 4566-1.09(a) ("The Board shall grant a temporary training permit ..."; emphasis added); and for the sake of analysis, we will make the same dubious assumption that he does. Moreover, he has alleged that the Board wrongfully distinguished between those with vision and those without in deciding which candidates were entitled to a temporary training permit. Therefore, both Mr. Brennan's due process and equal protection claims are properly alleged and we can lump them together for purposes of reviewing the rationality of the Board's decision.
 
 2. The Rationality of the Board's Actions
 
 37
 We must decide if the Board's actions were rational. The plaintiff argues forcibly that the "rational basis" test employed in City of Cleburne cannot be reconciled with the extreme deference usually accorded under that rubric to government decisions;[18] the plaintiff's view is not original, five members of the Supreme Court having reached the same conclusion. See City of Cleburne, 473 U.S. at 451, 458, 105 S.Ct. at 3260, 3263 (Stevens, J., joined by Burger, C.J., concurring; Marshall, J., joined by Brennan, J., and Blackmun, J., concurring and dissenting). We will therefore assume without deciding that our "rational basis" scrutiny of governmental decisions based on mental or physical handicaps is somewhat closer than usual.
 
 
 38
 But first we must determine exactly what Mr. Brennan alleges to be irrational. His attack is not well-focused, but it seems to be on the Board's decision to deny him a training permit. He complains of the Board's "irrebutable presumption" that those who could not satisfy the otoscopic examination requirement were not qualified to receive the training permit. The "irrebutable presumption" doctrine was a strange hybrid of "procedural" due process and equal protection invented by the Supreme Court in the early 1970s, and laid to rest soon after. See, e.g., Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (applying the doctrine); Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (effectively overruling it); see generally Note, The Irrebutable Presumption Doctrine in the Supreme Court, 87 Harv.L.Rev. 1534 (1974). The doctrine forced the government to grant hearings to persons who claimed to have been wrongly trapped inside overinclusive classifications; the idea was that even if a person clearly fell within a legislative class, due process required that he be given the opportunity to show that he "really" (that is, according to the "true" purpose or justification for the distinction) belonged on the other side of the legislative line.
 
 
 39
 Mr. Brennan's focus on the Board's decision suffers from a confusion similar to that evident in the "irrebutable presumption" doctrine. If the Board can require all applicants without exception to perform the otoscopic examinations as a condition of licensing, then surely its denial of his application was rational--indeed, inevitable. Mr. Brennan has never contended that he can fulfill the requirement (although he has suggested alternatives). Therefore, his attack is really on the rationality of the Board's rule that all applicants perform 15 hours of "ear mold impressions and otoscopic examinations of the ear." 22 Tex. Admin.Code Sec. 141.35(b)(1)(E). (Since the rule clearly falls on the "legislative" side of agency behavior,[19] we can avoid the constitutional and conceptual minefield of "quasi-legislative" versus "quasi-adjudicative" decisionmaking that our Court tiptoed through in Shelton v. City of College Station, 780 F.2d 475 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986).)
 
 
 40
 Even under the more searching inquiry that we provisionally assume to be mandated by City of Cleburne, the Board's decision is rational. The otoscopic examination requirement, of course, narrows the class of those eligible for a training permit to those who can use an otoscope. The Board's rule is based on the generalization that candidates who can visually inspect the client's ear will obtain a good deal more useful information about it and will be able to provide better care to the patient in the process of fitting a hearing aid. That generalization appears to us patently true, and Mr. Brennan does not seriously contend that it is false. It may be that some persons incapable of using an otoscope or visually inspecting the client's ear, such as Mr. Brennan, could on the whole provide better care than other persons who can fulfill that requirement; but, of course, a generalization cannot be falsified by pointing to a limited set of counterexamples.
 
 
 41
 Like all rational actors with limited resources, the Board must reach its abstract goal--licensing only those who can provide good care--by a series of practical requirements and easily-administered rules judged to be reasonable surrogates for it. That "fit" between ends and means is what we review when judging the rationality of the Board's rule; in this case, the Board's generalization about the relation between visual ability and providing good care is true enough, and the requirement based on the generalization is therefore rational. With the death of the "irrebutable presumption" doctrine, the Board is not constitutionally required to allow applicants to prove that they can fulfill the Board's abstract goal of good care even though they cannot fulfill the practical requirements instituted by the Board to reach its abstract goal. The requirement found in Sec. 141.35(b)(1)(E) is a reasonable way to advance the Board's legitimate goal of ensuring good care and thus does not violate the Constitution.[20]
 
 
 42
 None of this is to say that Board's rule is wise, or that its decision to reject Mr. Brennan's application was sound policy. The Constitution does not give citizens the right to good government; the pursuit of that high goal has been assigned to democratic institutions, creatures highly unsuited to it and thus relatively safe to undertake it. Rather, the Constitution insures against certain forms of bad government, assigning to an oligarchic judiciary the limited task of policing these lower precincts. The Board's actions did not fall below constitutional minima in this case.
 
 
 43
 D. Statutory Limits on the Power of the Board: the Rehabilitation Act
 
 
 44
 Mr. Brennan maintains that the Board and its members violated his rights under Sec. 1983 and under Sec. 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794.[21] See Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (violations of federal statutes by state actors give rise to a Sec. 1983 cause of action); cf. Helms v. McDaniel, 657 F.2d 800, 806 n. 10 (5th Cir.1981) (noting implied "private right of action" under Sec. 504), cert. denied, 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). "[T]he basic purpose of Sec. 504 ... is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or ignorance of others." School Board of Nassau County v. Arline, --- U.S. ----, ----, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987). Section 504 has been construed "as prohibiting disadvantageous treatment, rather than as mandating preferential treatment." Wimberly v. Labor & Industrial Relations Comm'n, --- U.S. ----, ----, 107 S.Ct. 821, 825, 93 L.Ed.2d 909 (1987).
 
 
 45
 The district court rejected all of Mr. Brennan's official capacity claims as barred by the Eleventh Amendment. As we have discussed at length above, this ruling was correct with respect to his claim for damages,[22] but incorrect with respect to his claim for equitable relief. Although the point is barely raised in the complaint and poorly briefed on appeal, the plaintiff has said enough to preserve his equitable and individual capacity damages claims, if any, under Sec. 504.
 
 
 46
 To establish a claim for relief under Sec. 504, the plaintiff must establish (1) that he is an "individual with handicaps" within the meaning of Sec. 504 and 29 U.S.C. Sec. 706(8)(B),[23] (2) that the disputed "program or activity" is federally funded, and (3) that he is "otherwise qualified." See Doe v. Region 13 Mental Health-Mental Retardation Comm'n, 704 F.2d 1402, 1408 (5th Cir.1983). There is no dispute that Mr. Brennan's blindness renders him an "individual with handicaps." Also, Mr. Brennan has alleged in his complaint that the Board is a recipient of federal funds within the meaning of Sec. 504, while the Board has denied that it is a recipient; because this fact remains in dispute we assume, as we must, that Mr. Brennan's allegation is true. Therefore, we must decide whether he is "otherwise qualified."
 
 
 47
 But first, one complication: In our Court, whether a handicapped person is "otherwise qualified" appears to be a question of fact. See Region 13, 704 F.2d at 1409 (applying the Boeing Co. v. Shipman[24] j.n.o.v. standard to a jury finding of "otherwise qualified"). Therefore, we can affirm the judgment in favor of the Board only if "reasonable men could not have differed" from the conclusion that Mr. Brennan was not "otherwise qualified."
 
 
 48
 The Supreme Court began the difficult task of figuring out the meaning of "otherwise qualified" in the unanimous decision of Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). There the Court appeared to hold that Sec. 504 does not require any affirmative efforts by federal grantees: "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." 442 U.S. at 413, 99 S.Ct. at 2370-71. But the Court made clear that under some circumstances the grantee might have some affirmative duties:
 
 
 49
 We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons will always be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of an opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory.
 
 
 50
 Davis, 442 U.S. at 412-13, 99 S.Ct. at 2370. Without exploring the possible ambiguities in this language as to the extent of the federal grantee's affirmative duties, our court read Davis to validate restrictions under a standard of "meta-reasonableness"; that is, to validate reasonable restrictions; and to give "reasonable deference" to the grantee's own determination of the restriction's reasonableness:
 
 
 51
 We read this landmark case under section 504 [Davis ] to support a reasonable deference to the decisions made by administrators of federally funded programs so long as no evidence is presented of discriminatory intent with regard to the handicapped person. To repeat, "an otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." [Davis,] 422 U.S. at 406, 99 S.Ct. at 2367 (emphasis added). This assumes, of course, that "a program's requirements" are reasonable. 442 U.S. at 414, 99 S.Ct. at 2371.
 
 
 52
 Region 13, 704 F.2d at 1410.
 
 
 53
 If the doctrine stopped here, we would probably deny Mr. Brennan relief. Because under Region 13 the reviewing judges and juries must give "reasonable deference" to the Board's decision to require ear impressions and otoscopic examinations--a restriction which we have already ruled permissible under the Due Process and Equal Protection Clauses of the Fourteenth Amendment--it would be difficult to take seriously the claim that reasonable persons could conclude that Mr. Brennan was "otherwise qualified" despite his undoubted inability to meet that requirement; rational factfinders probably could not conclude that, in the words of Davis, he could "meet all of a program's requirements in spite of his handicap."
 
 
 54
 But the development of Sec. 504 doctrine did not stop at Region 13. In another unanimous decision, Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court held that some sorts of restrictions with "disparate impact" could be actionable under the Rehabilitation Act without a showing of intentional discrimination; the Court resolved some of the ambiguities in Davis by elaborating on the extent of affirmative duties under Sec. 504:
 
 
 55
 Davis thus struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.
 
 
 56
 The balance struck in Davis requires that an otherwise qualified individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.
 
 
 57
 469 U.S. at 300, 105 S.Ct. at 720 (citation and footnotes omitted). Thus, under the standard of Alexander, the Board's restriction violates Sec. 504 if it denies "otherwise qualified" handicapped individuals "meaningful access"; and "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." The Board need not make " 'fundamental' or 'substantial' modifications" to its licensing requirements, but "it may be required to make 'reasonable' ones."
 
 
 58
 After Alexander it is clear that the phrase "otherwise qualified" has a paradoxical quality; on the one hand, it refers to a person who has the abilities or characteristics sought by the grantee; but on the other, it cannot refer only to those already capable of meeting all the requirements--or else no reasonable requirement could ever violate Sec. 504, no matter how easy it would be to accommodate handicapped individuals who cannot fulfill it. This means that we can no longer take literally the assertion of Davis that "an otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." 422 U.S. at 406, 99 S.Ct. at 2367 (emphasis added). The question after Alexander is the rather mushy one of whether some "reasonable accommodation" is available to satisfy the legitimate interests of both the grantee and the handicapped person. And since it is part of the "otherwise qualified" inquiry, our precedent requires that the "reasonable accommodation" question be decided as an issue of fact--meaning, of course, that it is one for the trial court or jury, subject to "clearly erroneous" or Boeing Co. v. Shipman review only. See Region 13, 704 F.2d at 1409.
 
 
 59
 We cannot decide the question posed by Alexander on the record before us. The district court mistakenly threw out all of Mr. Brennan's Sec. 504 claims, and there are no fact-findings on the now-crucial questions of "meaningful access" and "reasonable accommodation." Cf. Arline, --- U.S. at ----, 107 S.Ct. at 1131 (remanding for "otherwise qualified" determination because of inadequate development of facts). Therefore, we remand Mr. Brennan's claims for equitable relief under Sec. 504 and his claim for damages against the Board members in their individual capacities.[25]
 
 
 60
 We have already determined that the Board's requirements are reasonable ones. On remand, it will be Mr. Brennan's burden to demonstrate to the court some reasonable accommodation in these requirements which meets his special needs without sacrificing the integrity of the Board's licensing program.[26] The district court should look to relevant federal regulations for guidance. See Alexander, 469 U.S. at 304-306 & nn. 24-26, 105 S.Ct. at 722-23 & nn. 24-26. If Mr. Brennan makes that prima facie showing, the case thereafter "should be patterned after [a case under] Title VI of the Civil Rights Act of 1964." de la Torres v. Bolger, 781 F.2d 1134, 35 (5th Cir.1986); 29 U.S.C. Sec. 794a(a)(2). While it should be obvious, for the sake of clarity we point out that we have expressed no opinion about the merits of Mr. Brennan's Sec. 504 claims, including his allegation that the Board receives federal funds.
 
 E. Conclusion
 
 61
 We hold that Mr. Brennan's damages claims under the Fourteenth Amendment and Sec. 504 of the Rehabilitation Act against the members of the Board in their official capacities are barred by the Eleventh Amendment; we reject on the merits his claims for equitable relief under the Fourteenth Amendment--and a fortiori his constitutional claims for damages against members of the Board in their individual capacities; and we hold that his official capacity claims for equitable relief and individual capacity claims for damages under Sec. 504 cannot be resolved on the current record. We therefore REMAND the case with instructions to DISMISS the official capacity damages claims for lack of jurisdiction; to ENTER JUDGMENT in favor of the defendants with respect to all other constitutional claims; and to PROCEED with the Sec. 504 claims in a manner not inconsistent with this opinion.
 
 
 
 *
 Circuit Judge of the Ninth Circuit, sitting by designation
 
 
 [1]
 The statute governing training permits reads in part:
 (a) The Board shall grant a temporary training permit to fit and dispense hearing aids to any person applying to the Board who has never taken the examination provided in the Act and who possesses the qualifications in Subsection (b) of Section 6, of this Act [art. 4566-1.06(b) ], upon written application to the Secretary-Treasurer of the Board, the applicant shall make application on forms to be furnished by the Board furnishing sworn evidence that he possesses the qualifications contained in Subsection (b), Section 6, of this Act, that he has never taken the examination provided in this Act, and that he has never previously been issued a temporary training permit to fit and dispense hearing aids by the Board.
 (b) The application for a temporary permit shall be accompanied by the affidavit of a person duly licensed and qualified to fit and dispense hearing aids in this state. The accompanying affidavit shall state that the applicant, if granted a temporary training permit, will be supervised by the affiant in all work done by applicant under such temporary training permit, that affiant will notify the Board within 10 days following applicant's terminating of supervision by affiant.
 Tex.Rev.Civ.Stat.Ann. art. 4566-1.09(a)-(b). Subsection (b) of Section 6 includes requirements for applicants seeking to take the licensing exam:
 (b) The applicant shall make application, furnishing to the Secretary-Treasurer of the Board on forms to be furnished by the Board, sworn evidence that he has attained the age of majority and has graduated from an accredited high school or equivalent, and such other information as the Board may deem necessary for the enforcement of this Act.
 Art. 4566-1.06(b).
 
 
 [2]
 Pursuant to Art. 4566-1.09(b), Mr. Brennan's application was accompanied by an affidavit from a licensed hearing aid practitioner who averred that he would supervise Mr. Brennan in all work under the temporary training permit. After receiving the "final decision" of the Board, however, the practitioner quickly withdrew his promise to supervise Mr. Brennan's training
 
 
 [3]
 The Eleventh Amendment reads: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI
 
 
 [4]
 Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Congress has power to subject states to restrictions of Title VII); see also infra note 22. The Supreme Court has not decided whether Congress can override the Eleventh Amendment based on other sources of legislative power, such as the Commerce Clause. See Welch v. Dept. of Highways & Public Transportation, --- U.S. ----, ---- & n. 5, 107 S.Ct. 2941, 2946-47 & n. 5, 97 L.Ed.2d 389 (1987)
 
 
 [5]
 "While the rule permitting suits alleging conduct contrary to 'the supreme authority of the United States' has survived, the theory of Young has not been provided an expansive interpretation." Pennhurst, 465 U.S. at 102, 104 S.Ct. at 909 (quoting Ex parte Young )
 
 
 [6]
 For example, all institutional litigation involving state prisons or state mental health systems is in the federal courts under the fiction of Ex parte Young. See, e.g., Halderman v. Pennhurst State School & Hosp., 446 F.Supp. 1295 (1977), aff'd in part, rev'd in part, 612 F.2d 84 (3d Cir.1979), rev'd, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), on remand, 673 F.2d 647 (3d Cir.1982), rev'd, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (reform of Pennsylvania mental health system); Ruiz v. Estelle, 503 F.Supp. 1265 (S.D.Tex.1980), aff'd in part, rev'd in part, 679 F.2d 1115 (5th Cir.1982), rehearing granted, 688 F.2d 266 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983) (Texas prison system)
 In addition, although not usually conceptualized as Ex parte Young cases, most of the huge number of habeas claims in the federal courts under 28 U.S.C. Sec. 2254 are effectively suits against the states. These suits pass muster under the Eleventh Amendment because the habeas theory of a civil suit against the bad jailer fits perfectly with the Ex parte Young fiction.
 Furthermore, Ex parte Young cases make up a significant portion of the day-to-day business of the federal courts. In the Supreme Court's 1986-87 term, for example, at least 11 cases decided with full opinions were brought in the federal courts under Ex parte Young. See, e.g., Edwards v. Aguillard, --- U.S. ----, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (challenging "creation science" statute); Board of Pardons v. Allen, --- U.S. ----, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (prison regulations); O'Lone v. Estate of Shabazz, --- U.S. ----, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (same); Turner v. Safley, --- U.S. ----, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (same); Lukhand v. Reed, --- U.S. ----, 107 S.Ct. 1807, 95 L.Ed.2d 328 (1987) (preemption); O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (suit for damage under Fourth Amendment); California Coastal Comm'n v. Granite Rock Co., --- U.S. ----, 107 S.Ct. 1419, 94 L.Ed. 577 (1987) (preemption); Keystone Bituminous Coal Ass'n v. De Benedictis, --- U.S. ----, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (takings/due process); California Federal S & L Ass'n v. Guerra, --- U.S. ----, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (preemption); Tashjian v. Republican Party of Connecticut, --- U.S. ----, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (First Amendment claims); Munro v. Socialist Workers Party, --- U.S. ----, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (same). The exception is so well established that not a single one of these cases mentions the Eleventh Amendment or Ex parte Young.
 
 
 [7]
 Cf. Jones v. State of Louisiana through Bd. of Trustees for State Colleges and Universities, 764 F.2d 1183, 1185 & n. 2 (5th Cir.1985) (reversing Eleventh Amendment dismissal despite "technical pleading deficiencies" of naming the state agency as the defendant because complaint could fairly be read to join state officials as additional and proper Ex parte Young defendants)
 
 
 [8]
 The suit was brought against the Executive director of Napa State Hospital, "a public institution operated and owned by the State of California." Ortega v. O'Connor, 764 F.2d at 704
 
 
 [9]
 The crucial passage reads:
 The complaint in this case sought restoration of good-time credits, and the Court of Appeals correctly held this relief foreclosed under Preiser [v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ]. But the complaint also sought damages; and Preiser expressly contemplated that claims properly brought under 1983 could go forward while actual restoration of good-time credits is sought in state proceedings. Respondent's damages claim was therefore properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious misconduct. Such a declaratory judgment as a predicate to a damages award would not be barred by Preiser; and because under that case, only an injunction restoring good time improperly taken is foreclosed, neither would it preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations.
 418 U.S. at 554-55, 94 S.Ct. at 2974 (citation omitted).
 
 
 [10]
 Cf. Clark v. Tarrant County, Texas, 798 F.2d 736, 742 (5th Cir.1986) (Eleventh Amendment jurisdictional dismissal was proper in suit seeking damages only because inquiry into whether defendant is arm of the state was separate from the merits of the claim)
 
 
 [11]
 The appellant also argues that the Board violated his right to due process and equal protection by promulgating additional requirements for temporary training permits beyond its power under the Texas statute. This amounts to an assertion that the Board has run afoul of the Fourteenth Amendment by violating state law. The Fifth Circuit has already rejected this argument. See Stern v. Tarrant County Hospital Dist., 778 F.2d 1052 (5th Cir.1985) (en banc), cert. denied, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986)
 
 
 [12]
 See Duncan v. Louisiana, 391 U.S. 145, 166, 88 S.Ct. 1444, 1456, 20 L.Ed.2d 491 (1968) (Black, J., concurring)
 
 
 [13]
 Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)
 
 
 [14]
 E.g., United States v. Salerno, --- U.S. ----, ----, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (law permitting pre-trial detention based on the accused's dangerousness does not violate "substantive" due process under Fifth Amendment)
 
 
 [15]
 E.g., Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (pumping suspect's stomach for evidence is unconstitutional)
 
 
 [16]
 An analogous standard would presumably apply to administrative or ministerial acts
 
 
 [17]
 See Roe v. Wade, 410 U.S. at 173, 93 S.Ct. at 736 (Rehnquist, J., dissenting)
 
 
 [18]
 See, e.g., New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)
 
 
 [19]
 For a classic discussion of the distinctive qualities of adjudication compared to legislation and other forms of social ordering, and an analysis of the "mixed" and "parasitic" forms often used by administrative agencies, see Fuller, The Forms and Limits of Adjudication, 92 Harv.L.Rev. 353, 381-409 (1978)
 
 
 [20]
 As noted above, the Board's "rejection" letter was equivocal; it included an invitation to Mr. Brennan to come before the Board to argue his case in an informal hearing. Thus, although not required to by the U.S. Constitution, the Board hinted that it might be willing to make an exception for Mr. Brennan if he took his case to them directly and convinced them of his ability. Compare the requirements of Sec. 504 of the Rehabilitation Act of 1973, discussed infra at section D
 
 
 [21]
 The relevant part of Sec. 504 reads:
 No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 [22]
 See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (Eleventh Amendment bars damage claims against the states under Sec. 504). The parties do not mention it, but we note that Scanlon has been legislatively overruled for claims arising after October 21, 1986. See 42 U.S.C. Sec. 2000d-7
 
 
 [23]
 The relevant part of Sec. 706(8)(B) reads: "[T]he term [sic] "individual with handicaps" means ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment...."
 
 
 [24]
 Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)
 
 
 [25]
 It appears likely to us that the members of the Board are entitled to qualified immunity; the question of liability under Sec. 504 is sufficiently obscure that neither party has been capable of presenting it clearly and cogently either to the district court or to us. When the lawyers are incapable of recognizing and properly arguing the law, we think it doubtful that the law can be considered "clearly established" from the point of view of the clients. Because of the factual gaps in the record, however, we leave this question to the district court
 
 
 [26]
 The failure of Mr. Brennan to accept the Board's invitation to appear before it may figure substantially in the calculation of any damages which the court may award